THE PEOPLE v. WILLIAM REPKE.

*Criminal law—Murder—Degree—Duress—Instructions to jury.*

1. Where, under the proofs in a homicide case, the killing is shown to have been committed by lying in wait, and by a preconceived plan willfully and deliberately to take life, it is not error to instruct the jury that, if the respondent is guilty at all, he is guilty of murder in the first degree.

2. A threat to take one's life, made three days before the perpetration of a murder, unless the party threatened aids in the commission of the crime, will not excuse him from liability for aiding and assisting in the murder.

3. It is not error to instruct the jury in a homicide case that if they find that, at the time of the killing, the respondent actively participated, that he aided, either by being present on guard, or by counseling and encouraging others to commit the crime while thus present with that intent, he is equally guilty with those who inflicted the mortal wound.

Error to .Alpena.    (Kelley, J.)    Argued October 25, 1894.    Decided January 4, 1895.

Respondent was convicted of murder in the first degree, and sentenced to imprisonment in the State prison for life. Judgment affirmed.    The facts are stated in the opinion.

*J. D. Turnbull,* for respondent.

*A. A. Ellis,* Attorney General, and *James McNamara,* Prosecuting Attorney, for the people.

LONG, J.    Respondent was convicted in the Alpena circuit of the crime of murder in the first degree, and sentenced to imprisonment in the State prison for life.

It appears from the uncontradicted evidence that on August 23, 1875, 12 persons, among whom was respondent, met at a place known as "Reinke's Hill," about 4½

miles from Rogers City, in Presque Isle county; and after talking over the object of the meeting, and taking an oath to keep secret what should take place, they went together to Rogers City, arriving there in the evening, and shot through the window and killed Albert Molitor, while he was engaged in his business in the office connected with his store. The undisputed evidence shows that it was the understanding before they left Reinke's Hill that they should go and kill Molitor. That was their business to Rogers City that night. The evidence as to the murder, the manner of killing, and the circumstances surrounding the same were uncontradicted.

The respondent himself took the stand, and testified that he was present, and saw Molitor shot, and that he was shot through the window on the night in question by some of the party with whom the respondent visited Rogers City, but that he did not do the shooting himself. A number of the persons who were present and assisted more or less in the murder testified that the respondent was one of the ringleaders in the conspiracy to take the life of Molitor. Stephen Reiger testified that respondent came to him, and got him to join the enterprise on the theory that they were going to kill' a bear; and that he was not acquainted with the facts of the object of the meeting until he had actually arrived at the hill on the evening the murder was committed. Frederick Sorgenfrei testified that respondent went through the township and got the men to meet at the hill. Ferdinand Bruder testified that respondent came to his house on the day they met at the hill, and told him, if he did not go, he would be killed. The respondent testified that, when near Rogers City, Barabas, one of the party, went forward to see if he could kill Molitor alone; that they heard a shot, and then there was some talk about going, but Grossman said they would have to stay, because maybe they had got Barabas,

and, if so, they would have to go and get him free; that Barabas came back, and, having fired off his gun while he was gone, had to reload it there, in the presence of respondent and the others. Respondent then says:

"He load his gun, and then we go along, and as we come along he tell us Molitor was there in the office, and we go right around on the office window. Where every man is going from that time I can't say. Them four men, Jacobs, Barabas, Fuhrmann, and Grossman, go right from the window close on the corner of the window, and stand up on the window, right short. I was standing there by the telegraph poles and fence posts, and all kinds of wood laying there. * * * Then, at once, Molitor come out of little room, out of other little room, and had a big book on his hand, on his arm. And, so as he come out of that little room out, them four men raised up his gun onto the window, and Molitor go with the book, and lay the book, the clerk sitting there, he lay the book to the table, and, so as he put the book on this table, that minute he shooting. Molitor don't sit down at all. Just he lay the book down, that minute Molitor fall down. Molitor holler up, 'Oh, God!' I turned around and run away."

The evidence shows that Molitor was shot with several buckshot, coming from different angles, in his side and back, having been sitting or standing with his side to the window when the guns were discharged. A young man by the name of Sullivan, a clerk in Molitor's employ, was shot at the same time, and, some of the witnesses testify, by the respondent.

The theory of the people was that respondent was one of the willing participants in this murder. The respondent, on the other hand, contended that he assisted in the killing of Molitor, or went with the party, for the purpose of protecting himself, so that he might afterwards be unmolested, or, as claimed by his counsel, because he was compelled by threats to go. Respondent testified as to the threats, substantially, that the first his attention was

called to the killing of Molitor was some three days before the crime was committed. He says that Banks came to him, and told him that Hoeft and Molitor were having a lawsuit; that, if Molitor lived, he would beat Hoeft, and in such case all the farmers would have to run away; that Molitor should be shot. In answer to this he says he told Banks:

"I can't go along with you to shoot a man. Mine heart can't do that to shoot a dog. I got a bad dog. I got to ask mine neighbor to come and shoot him. I can't do it myself."

To this Banks replied that they had four men to do the shooting, and that twelve men would make a jury, and what "twelve men do everybody got to follow." Respondent replied, "I got no gun;" and Banks said: "I furnish you some things for that time, and you got to go. I told you about that now; you got to come." Respondent said he did not like to go, when Banks answered: "Well, you got to go if you like to live. If you back out, if you don't come, maybe we shoot you on the same night, and you been shot the first night if we can get you." Respondent says that at the time Banks told him to come to the hill on the third night following, and he asked who would be there, and Banks said: "You don't need to know that. You come on that place where I tell you. You find all the man come together there, and you will find out who is there." He says, further, that, after Banks went away, he went into the house, and told his wife what Banks had said. She cried, and he told her he would not go. But she said: "Well, maybe you could go, and you do nothing, and nobody could do you nothing." And he said he would go to the hill, and find out who would go. He joined the party, made no protest, took the revolver furnished him, and went with them. He drank with the rest on the way down. He says that, when Banks gave him the

revolver, he told him it would come handy when he went
into the store to fight. It also appears from the respond-
ent's testimony that, some time after the murder, Hoeft
gave him $100 not to go away out of the country, as Hoeft
was afraid that he (respondent) would talk about it. He
was asked if Banks told him that Molitor and Hoeft had
a lawsuit.

"*A.* Yes.

"*Q.* And that, if Molitor lived, he would win the case?
"*A.* Yes.

"*Q.* And you wanted to kill him so he could not tes-
tify in the case?

"*A.* That is what he told me.

"*Q.* That is the way you understood it?

"*A.* Yes.

"*Q.* Really what you were down there for to kill Mol-
itor, to help those folks, was simply to help Hoeft out?

"*A.* Yes.

"*Q.* You went along to protect them, to keep them if
they went in, anybody jumped onto them,—get them
clear?

"*A.* Yes.

"*Q.* That was what you agreed to do? That is what
you went for?

"*A.* Yes."

He was also asked:

"Mr. Repke, what made you go that night with those
people down to Rogers City to murder Molitor? What
forced you to do this?

"*A.* I was scared for mine living. If I don't go to kill
Molitor, if I don't stay, I should be killed.

"*Q.* You were afraid they would kill you if you didn't
do this?

"*A.* Yes.

"*Q.* Is that the reason you went and took part?

"*A.* Yes.

"*Q.* Would you have gone if you had not been afraid?

"*A.* If I was not afraid, I would not go. Molitor was
mine best friend."

This is substantially all the testimony bearing upon the
questions raised in the case. It appears from this that

the threats, if any were made, were made by Banks three days before the murder. No one threatened him at the hill. No one but Banks told him he must go. Banks was not at the hill, and it is not claimed that Banks was present at the murder. The substance of the threats, as claimed by respondent, was that, three days before the murder, Banks told him that, if he did not go, when they caught him they would kill him.

At the close of the testimony, the respondent's counsel asked the court to instruct the jury as follows:

"1. That in order to find the defendant guilty, in this case, of murder, the jury must find that the defendant, at the time of the transaction and killing, was a free agent.

"2. If the jury find that the defendant was coerced into taking part in this transaction, then he is not guilty of murder.

"3. In order to convict defendant of murder, the jury must find that defendant either aided, abetted, or counseled the killing of Albert Molitor.

"4. The fact of defendant going with these other parties that killed Albert Molitor at Rogers City, and meeting with them at Reinke's Hill, or being present at the shooting, is not enough to convict defendant of murder. In order to make defendant guilty of murder, the jury must find that the defendant did certainly aid, abet, or counsel the killing of Albert Molitor, and this must be determined from all the evidence and all the circumstances surrounding this transaction, and the jury must find this beyond a reasonable doubt.

"5. There is no evidence in this case that will warrant the jury in finding that defendant fired the shot that killed Molitor. Therefore the jury must find that the defendant voluntarily accompanied or assisted those who did the killing. Unless the jury find this beyond a reasonable doubt, then they must acquit defendant.

"6. The jury must find beyond a reasonable doubt that defendant voluntarily united himself with those who did the killing in this case, and either aided, abetted, or committed the same. Unless the jury so find, they must acquit the defendant of murder."

These requests were refused, except as given in the gen-

eral charge. Upon the degree of the offense, the court charged:

" If respondent is to be convicted at all, he must be convicted of murder in the first degree. There is no evidence in this case upon which a verdict of murder in the second degree or any lesser grade of crime could be permitted to rest. * * * If you can reconcile his conduct, his actions, consistent with any theory of innocence, he is entitled to the benefit of such theory; and it is your duty to give him the benefit of the reasonable doubt."

The court also gave the jury the definition of "murder," and the degrees into which the statute divides it, and what would constitute murder in the first degree under the statute, and directed them that,—

"Before you can convict this respondent of murder in the first degree, it is necessary that the people should have convinced your minds that respondent, on the night in question, either inflicted the mortal wound, or that he was present, aiding, assisting, or in some manner abetting the commission of this offense. The burden is upon the people to convince your minds that he was there, participating, aiding, and assisting in the commission of this crime."

The jury were also directed fairly upon the question of reasonable doubt, and that, if there existed such a doubt, they must acquit.

Upon the question of respondent's being coerced into going, the court charged the jury as follows:

" The law will not excuse a criminal act because committed under influence of fear, unless it clearly appears that such fears were founded on some reasonable ground. No duress will excuse from punishment, unless it be an actual compulsion by the use of force. The duress or compulsion must consist in such force exercised towards the person as puts him in present fear of death or great bodily harm. Threats of future injury will not excuse. A threat to take one's life at some future time, unless the person so threatened commit or aid in the commission

of a felony, is quite insufficient to excuse the commission of a felony by the person so threatened.     *     *     *     No man, from fear of some future consequences to himself, has a right to make himself a party to the commission of the crime of murder; and I charge you in this case, gentlemen of the jury, that, under the testimony of Repke and the evidence in this case, no such state of facts exists as to coercion or duress used as would justify Mr. Repke in participating in the commission of this crime.  A mere threat that, if he did not go at a future time and aid in the commission of the murder, he would be killed, would not be sufficient."

The jury returned a verdict of guilty of murder in the first degree.

1. It is contended that the court was in error in directing the jury that, if they found respondent guilty, it must be of murder in the first degree.  Section 9075, How. Stat., provides:

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree," etc.

Section 9076 provides:

"All other kinds of murder shall be deemed murder of the second degree," etc.

Section 9077 provides:

"The jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree; but, if such person shall be convicted by confession, the court shall proceed by examination of witnesses to determine the degree of the crime, and shall render judgment accordingly."

Section 9428 provides:

"Upon an indictment for any offense consisting of different degrees as prescribed in this title, the jury may find

the accused not guilty of the offense in the degree charged in the indictment, and may find such accused person guilty of any degree of such offense inferior to that charged in the indictment, or of an attempt to commit such offense." [1]

Section 28, art. 6, of the Constitution provides that—

"In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury," etc.

The contention is that, under these provisions of the statute and Constitution, it was the exclusive right of the jury to determine the degree of the murder, and that, by the instruction given to them, the court determined the degree; and, if the court had this right, then, if the jury should fail to find the degree in their verdict, the court would have the right to fix it.

We quite agree with counsel that it was the duty of the jury to find the degree of the murder in their verdict. It was said in *Tully v. People*, 6 Mich. 273:

"The statute (Comp. Laws 1857, § 5713) is imperative that the jury in their verdict, or the court on plea of guilty, shall determine the degree of crime."

The verdict rendered in that case simply found the respondent guilty in manner and form as charged in the indictment. The court sentenced respondent to imprisonment for life, and the case was reversed in this Court for the above reason.

In *People v. Hall*, 48 Mich. 482, the information merely charged murder, without charging in what way it was committed, or in what degree, and it was said that—

"Under the statute, the jury must find the degree of the offense, and it cannot be treated as murder in the first degree unless expressly so found."

---

[1] As bearing upon the construction of this section, respondent's counsel cited *Hall v. People*, 47 Mich. 638; *People v. Prague*, 72 Id. 180; *People v. Miller*, 96 Id. 119; *People v. Abbott*, 97 Id. 484.

In *People v. Potter,* 5 Mich. 8, it was said:

"The duty of ascertaining the degree of the crime is peremptorily imposed upon the jury."

But in the present case, under the proofs, if the respondent was guilty at all, it was of murder of the first degree, as it was committed by lying in wait, and by a preconceived plan willfully and deliberately to take life. There is no dispute about it. There is no contention that it was accidental, or that it was committed in self-defense. There is no fact or circumstance that would reduce it below the first degree. The murder was committed; the respondent testified to it himself; and it was committed in the manner and form pointed out by the statute as constituting murder in the first degree. As was said in *People v. Hall, supra:*

"Murder by poison, under the statute, is always murder in the first degree, and the jury should have been so charged."

The error in that case was that the jury were not so charged, but were left by the charge to find the degree, and did not find it to be the first degree; but the court treated it as murder in the first degree, not only by so naming it, but also by inflicting the statutory punishment for that crime.

Under this same provision of the statute, murder by lying in wait is murder in the first degree, and it was the duty of the court so to charge. It was not the province of the jury to find a different degree of the offense under the facts shown, as it would have been a clear violation of this statute. In criminal as well as in civil cases it is the duty of the court to instruct the jury upon the law, and it is the duty of the jury to accept the ruling, and be guided by it. *Hamilton v. People,* 29 Mich. 173; *People v. Mortimer;* 48 Id. 37. But, as was said in the last case:

"It is; no doubt, in their power to disregard evidence, and to acquit persons whom they know to be guilty."

The court in the present case did recognize this power, and expressly told the jury that they could acquit, but, if they found the respondent guilty at all, it must be for murder in the first degree. There was no question but that the murder was committed by lying in wait, and there is no question, under this statute, but that murder committed in this way is murder in the first degree. The Court said in *People v. Murray*, 72 Mich. 16:

"Without any requests from counsel, it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he should state to them fully the law applicable to the facts. Especially is this his duty in a criminal case."

In *Baker v. People*, 40 Mich. 411, the court charged the jury that the verdict should be either guilty of murder in the first degree, or not guilty. It was said by this Court:

"There was no claim or pretense that the murder, if committed, was perpetrated by means of poison or lying in wait. If there had, perhaps the charge given might have been proper. There were facts from which the jury might have found that it was a willful, deliberate, and premeditated killing; but this was a question for them to determine from all the evidence in the case. It may have been a sudden affray, or in self-defense that the fatal blow was struck; and, although the court may have been of opinion that such was not the case, yet it still remained a question for the jury to determine under all the facts, and they certainly may have found that the crime committed was not in the same degree as the court assumed."

The Iowa statute is substantially like our own. It divides murder into two degrees, and provides that all murder which is perpetrated by means of poison or lying in wait, etc., is murder of the first degree. In *State v. Johnson*, 8 Iowa, 525, the trial court directed the jury that—

"The form of your verdict will be as follows, if you find the defendant guilty: 'We, the jury, find the defendant

guilty of murder in the first degree;' or, if you find the defendant not guilty, you will say: 'We find the defendant not guilty.'"

This was held not to be error.

In *Clark v. Com.*, 123 Penn. St. 555, it was held that when no controversy was made that, upon the evidence, the murder was perpetrated by lying in wait and to accomplish a robbery, it was not error to omit to instruct upon the law of voluntary manslaughter, and upon the power of the jury to find such verdict in the cause. The Pennsylvania statute is similar to our own.

In *People v. Wright*, 93 Cal. 564, it was held that an instruction that the defendant must be either convicted of the offense charged or acquitted is proper, when there is no evidence of any lesser offense, and the evidence shows that he is guilty of that charge or not at all. The offense charged in that case was mayhem. A similar holding was made by the same court in the case of *People v. Barry,* 90 Cal. 41, which was a charge of attempted robbery; and also in the case of *People v. Madden,* 76 Cal. 521, which was an assault with intent to commit the crime of murder. See, also, the following cases, holding that this rule applies to trials for homicide: *State v. Turlington,* 102 Mo. 642; *O'Brien v. Com.,* 89 Ky. 354; *Jones v. State,* 52 Ark. 345; *State v. Munchrath,* 78 Iowa, 268; *McCoy v. State,* 27 Tex. App. 415.

The verdict of the jury in the present case is in form that of murder in the first degree, and the direction of the court that they must so find, or acquit the respondent, was proper under the evidence. Any other instruction than this, under the facts and circumstances shown, would have been very improper, as there was no evidence warranting a different direction, and no circumstances which would lessen the degree. It was a willful, deliberate murder, perpetrated by lying in wait, and the statute itself

fixes the degree. The charge was not in violation of the statute above quoted. Neither is it in violation of any constitutional right; as in *People v. Richmond*, 59 Mich. 570, it was said:

"Where all of the facts essential to a conviction are admitted, there is nothing for a jury to pass upon, and it is not error for the court to direct a verdict of guilty."

The same doctrine was held by this Court in *People v. Ackerman*, 80 Mich. 588; *People v. Neumann*, 85 Id. 98.[1]

2. It is next contended that the court erred in refusing the requests of counsel for respondent on the question of duress, and in directing the jury that no such state of facts existed as to coercion or duress used as would justify respondent in participating in the commission of the crime. We think this charge warranted by the circumstances and the testimony of the respondent himself. It would be a strange rule that would permit one to escape punishment for the crime of murder upon the plea that, three days before the crime was to be committed, he had been told that he would himself be killed if he did not go and assist; and especially under the circumstances as detailed by respondent himself. The general rule upon the subject of duress as an excuse for crime is laid down in Stephen's Digest of Criminal Law (article 31), as follows:

"An act which, if done willingly, would make a person a principal in the second degree, or an aider and abettor in a crime, may be innocent if the crime is committed by a number of offenders, and if the act is done only because, during the whole of the time in which it is being done, the person who does it is compelled to do it by threats on the part of the offenders instantly to kill him, or to do him grievous bodily harm, if he refuses; but threats of future injury, or the command of any one not the husband of the offender, do not excuse any offense."

---

[1] See *People v. Collison*, 85 Mich. 105, holding that it is error for the court, under such circumstances, to direct the clerk to enter a verdict of guilty.

Lord Chief Justice Lee, in *MacGrowther's Case*, 18 State Tr. 394, which was a case of treason, the defense being duress and compulsion, said:

"The only force that doth excuse is a force upon the person and present fear of death; and this force and fear must continue all the time the party remains with the rebels."

Threats of future injury do not excuse any offense. Whart. Cr. Law (9th ed.), § 94. The necessity which will excuse a man for breach of law must be instant and imminent. Bish. Cr. Law (7th ed.), § 352. We think the charge upon this subject was warranted by the evidence, and is fully sustained by the authorities.

By the sixth assignment of error, it is contended that the court charged, in substance, that the jury must find the respondent guilty of murder in the first degree. What the court did charge was:

"There is no such duress shown, and no such coercion shown, as would excuse him, if you find that he, at the time this murder was committed, and on that night, actively participated; that he met, went forward, aided, either by being there upon guard, or by counseling and encouraging, the commission of that crime.  *  *  *  If he was there for the purpose, intending to aid and encourage the commission of this crime, he would be equally guilty with the person or persons who inflicted the mortal wound."

It was claimed by the prosecution, and some testimony was given tending to show the fact, that respondent actually fired upon the clerk. The charge was full and fair, and presented the respondent's theory in all its phases, and protected every right to which he was entitled under the circumstances.

We have carefully examined the case, and are satisfied that respondent has had a fair and impartial trial; and the judgment must be affirmed.

The other Justices concurred.