STATE OF IOWA, Appellee, v. LOUIS CLAY, Appellant.

No. 43003.

DECEMBER 17, 1935.

W. F. Murphy, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Assistant Attorney General, and E. A. Baldwin, County Attorney, for appellee.

MITCHELL, J.—On October 9, 1934, the grand jury of Johnson county, Iowa, returned an indictment against the defendant, Louis Clay, charging him with the crime of murder "in that the said Louis Clay in the county and state aforesaid on or about the 24th day of December, 1933, wilfully, deliberately and premeditatedly and with malice aforethought murdered George J. Folsom." The defendant entered his plea of not guilty, and upon trial to a jury was convicted of murder in the first degree and sentenced to life imprisonment, from which judgment of the court this appeal is taken.

George J. Folsom was a bachelor, living alone in an eight-room house on the south side of what is known as the Newton road, near the west side of Iowa City. At the time of his death he was seventy-seven years of age. He was the survivor of a

family consisting of two brothers—James and Arthur—and a sister, known as Molly. Beginning the latter part of October of 1933 he had a serious sick spell, described by the doctors as the flu and pneumonia, with a heart complication. Although a man of wealth, he desired to live alone, and for some reason or other saw fit to live in the kitchen of the large house, sleeping upon a cot, and heating the room with a stove in which wood was used as fuel. During this sick spell he had had first a Mr. Brown look after him, and then a Mr. Gould, who came in the morning and stayed until about noon. On the morning of December 24, 1933, Gould came as usual and performed the duties required of him, which, among others, consisted of bringing in water and fuel. About noon he left. That evening a Mr. Boot, who was a friend and neighbor, called at the Folsom house and remained a couple of hours, from about 5 to 7 o'clock. At that time Folsom was up and around the kitchen of the house and was in good spirits. The witness Boot was the last one to see the decedent alive. On the morning of December 25th, when Gould came to do his work, around 9 o'clock, he found the door leading into the kitchen partly open, with a stick of wood lying in the door in such a position that the door would not close. The weather was very cold; the thermometer registered around zero. There was no fire in the kitchen stove. Gould discovered Folsom lying on the floor, at the head of the bed, dead, and his body frozen. Immediately he went to the Brown house nearby and telephoned to Judge O. A. Byington of Iowa City, a person named by Folsom to be called in the event anything happened to him. Gould and Brown returned to the Folsom house, and before long Judge Byington, accompanied by the coroner, Dr. Maresh, a regular practicing physician at Iowa City, arrived. After a while an undertaker was sent for, and in due time, without making any autopsy or any further investigation than was made that morning, Folsom's body was embalmed and the remains were buried. It was the belief of all of these people, the coroner, Judge Byington, the two men who took care of Folsom, and the undertaker, that Folsom had come to his death through natural causes. No inquest was held, no autopsy was performed. There is testimony that there was a small abrasion on Folsom's wrist and two bloodspots on the sheet on the cot. But neither the condition of the wrist nor the bloodspots aroused the suspicion of any of these men that Folsom had not died a natural

death. As far as this record shows, there was no doubt in the mind of any of the officials of Johnson county, the friends and neighbors, or any one else that George Folsom had died from the disease from which he was suffering, which the medical men describe as myocarditis, a disease of the heart, until in August of 1934, when one Mabel Davis made a statement to the chief of police of Waukegan, Illinois, stating that on Christmas Eve of 1933 Louis Clay had murdered George Folsom.

Louis Clay, who is a colored man, had lived around Iowa City most of his life. For a period of some time he worked in a garage at Cedar Rapids. There he met Mabel Davis, who was about twenty years of age, having the appearance of being a white woman, although the record shows she is one-eighth colored, her father having been colored and her mother white. Clay was twenty-six years of age when he met Mabel. They kept company in Cedar Rapids and then Clay went back to work in a garage at Iowa City. Mabel went to Iowa City also, staying first at a hotel and part of the time at the home of Clay's mother. On Christmas Eve of 1933 Mabel testified she went to the Clay home, which was somewhere near the Rock Island station in Iowa City. Louis was there, as were his mother and sister. Louis, she testified, suggested a ride in his automobile, and they started off. They drove to the southwest corner of the University Stadium on the west side of the Iowa river in Iowa City, and there parked the car. Getting out of the automobile they walked across a field, then across the golf links, and when they approached the Folsom house Mabel claims Clay said to her, "Knock at the door and tell him you want to get warm." It is Mabel's testimony that she did not know what Clay intended to do. She asked no questions. She did as Clay suggested; walked up on the back porch and rapped on the kitchen door. When Folsom opened the door, Mabel said to him she would like to get warm, stepped inside, and Clay followed. It is her story that when Clay got inside the house he pulled a gun and said to Folsom, "It's a holdup," then took from his pocket a rope, with which he tied together the old gentleman's hands. Clay, Folsom, and Mabel went from the kitchen into an adjoining room, in which there was a safe. Clay demanded that Folsom give him the combination, which he did, and Clay handed the gun to Mabel, who held it while Clay opened the safe and investigated the papers therein and took therefrom fifteen $1 bills, together

with some jewelry and other trinkets. Mabel knew exactly what Clay took from the safe; she looked over the various articles. She testifies the three of them went back to the kitchen, where Clay searched the bookcase and cupboard, in which he found three small pocketbooks containing approximately $3 in money, and some coins which Folsom had collected. During all of this time Mabel held the gun that Clay had used in holding up Folsom. This is her own story. She made no objections to anything that was done until Clay said he believed he had better do away with the old man because of the fact that he (Clay) was colored and she was white and they would be able to trace them. Clay then choked Folsom. Mabel says she protested against this but made no outcry, nor did she in any way attempt to assist Folsom or stop Clay from doing what she says he was doing. Clay pronounced Folsom dead, cut off the ropes with which Folsom's wrists had been bound, and burned them in the stove. He put Folsom in a sitting position towards one corner of the room, and placed a stick of wood in the doorway to hold the door open. Mabel and Louis then left the house, walked back across the golf links and the field to where they had parked the car, got into the car and drove around and examined the jewelry which they had taken, disposing of that which they thought of little value, retaining only the coins, the money, and the two rings. Then they went back to Clay's mother's house where Mabel stayed all night.

This is Mabel Davis' story of what happened on that Christmas Eve. If it is true, the crime was an outrageous one, and no punishment would be too severe for any one who was guilty of such a cold-blooded murder. But, the guilt of Clay rests entirely upon the testimony of Mabel Davis, whose connection with this crime, as will be set out in this opinion, demands that her testimony be carefully scrutinized that no injustice be done to the defendant.

The defendant Clay took the witness stand and denied that he had anything to do with the murdering of George Folsom, testifying that on the evening of December 24, 1933, at the hour that Mabel Davis claimed he was at the Folsom home, he was escorting his twin sister Lucille to the Rock Island station, where she took the night train for Chicago. His testimony is corroborated by that of his mother and his sister.

It is Mabel's testimony that she lived around Iowa City

until the latter part of March, 1934; that she and Clay went together during that period of time; that she had possession of the two rings taken from the Folsom house and wore them at different times. Early in March of 1934 at her suggestion Clay drove her to Waukegan, where her mother lived; that when they got there a license to wed was taken out, but, due to some misunderstanding or dispute that arose between them, it was not used at that time. On the 27th of March Clay returned to Iowa City and Mabel remained in Waukegan. After Clay's return from Waukegan, he received from Mabel several letters which contained endearing terms, and she also sent him a photograph of herself, on which she had inscribed in her own handwriting the words, "To Lewis. With love, Mabel." She also sent him a card, which was framed, containing a very endearing sentiment, upon the back of which she wrote in her own handwriting, "With love to Lewis. Hope you understand the meaning of this little photograph. Mabel." In April Clay received a letter from Mabel, urging him to return to Waukegan, and he went there on the 17th of April. On the 30th of July, 1934, Mabel and Clay were married, and on the 24th day of October, 1934, they were divorced or the marriage was annulled. The record is not clear in regard to this. In August Mabel Davis told the story for the first time of what she claimed occurred on December 24, 1933, at the Folsom house in Iowa City.

▍▍▍ In April of 1934, when Clay went to Waukegan to see Mabel at her mother's home, there was some dispute or some trouble between them. It is Mabel's claim that he attacked her with a black-jack and threatened her life. There is corroboration of this by way of the testimony of a policeman from Waukegan. This testimony was objected to at the time it was offered and was admitted only by the court on the theory that it was corroboration of Mabel Davis' testimony that she was in fear of Louis Clay and had reason to be afraid.

The court gave the following instruction, No. 30½, to the jury covering this testimony:

"Reference has been made in argument of counsel to testimony relating to trouble between the witness, Mabel Davis, and the defendant, in Waukegan. You should understand that this evidence is not admissible for the purpose of showing the defendant to be of bad character or to have committed another

crime or offense, and should not be so received or considered by you. It is only admissible and should only be considered as affecting, if in your opinion it does, the question of whether or not his conduct and disposition was such as to excite fear on the part of Mabel Davis, and the further question of whether or not there has since existed ground for ill feeling or animosity between them.''

I. In this appeal the appellant strenuously argues that the admission of this testimony and the instruction given by the court were erroneous and prejudicial to him.

This court in the case of State of Iowa v. Vance, reported in 119 Iowa 685, 94 N. W. 204, has set out the exceptions when evidence of another crime, not alleged in the indictment, is admissible. This court said, at page 686:

''The state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for separate punishment or as aiding the proofs that he is guilty of the crime charged. The exceptions to the rule may be classified as follows: Evidence as to other offenses is competent to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others, and (5) the identity of the person charged with the commission of the crime on trial. These exceptions are illustrated and applied in the following among other cases: State v. Walters, 45 Iowa 389; State v. Jamison, 74 Iowa 613, 38 N. W. 509; State v. Desmond, 109 Iowa 72, 80 N. W. 214; State v. Brady, 100 Iowa [191], 195, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; State v. Lewis, 96 Iowa, 286, 65 N. W. 295; Van Staden v. Kline, 64 Iowa [180], 183, 20 N. W. 3; State v. Saunders, 68 Iowa 370, 27 N. W. 455.''

The rule laid down in the above-cited case was approved by this court in State v. Browman, reported in 191 Iowa 608, 182 N. W. 823.

The evidence which the court admitted on the theory that it would show the fear that Mabel Davis had for Louis Clay was evidence of an attack which she claimed was made upon her almost four months after the alleged crime was committed, to wit, in the month of April, 1934. During that four-month period we

find a very friendly relationship existing between Mabel Davis and Louis Clay. Not only did they go together, but when she went to Waukegan she wrote him letters, using endearing terms, sent him a framed card on which she had inscribed in her own handwriting a personal message, and to show beyond any question that a friendly relationship existed and that she was interested in Clay, she forwarded to him her photograph, upon which there were written, in her handwriting, the words, ''To Lewis. With love, Mabel.'' During that four-month period, we find no evidence in this record to show any threats on the part of Clay or any fear on the part of Mabel of Clay. How could the testimony of the quarrel in Waukegan in April of 1934 possibly show that Mabel Davis had cause to fear Louis Clay back in December of 1933? There is no showing, nor is there any claim that threats were made during the four months that elapsed between the two dates. But instead we find undenied and uncontradicted evidence of a friendly relationship between Mabel Davis and Louis Clay. And, by her own testimony and acts, Mabel was the aggressor in the promoting of this relationship between these two people.

The State has referred us to but four cases. We have examined all of them. In all of the cases cited we find that the evidence which was admitted shows some circumstance which took place at the time the crime was committed or shortly before. We have made a careful search of the cases and find none where testimony of a quarrel some four months after an alleged crime was committed was admitted to show the frame of mind of one of the witnesses. The evidence of the claimed attack by Louis Clay upon Mabel Davis, which took place four months after the alleged crime was committed, and is not in any way connected with the crime or with the mental condition of Mabel Davis at the time the alleged crime was committed, should not have been admitted and the court was in error in admitting it. To say the least, it was highly prejudicial. The instruction which the court gave did not in any way correct the error that was made. The court said: ''It is only admissible and should only be considered as affecting, if in your opinion it does, the question of whether or not his conduct and disposition was such as to excite fear on the part of Mabel Davis.'' Fear, at what time? The question is, ''Was she in fear of Louis Clay on the evening of December 24, 1933?'' The court did not limit the

instruction to that specific date or to any date. Under the instruction, if Mabel Davis was in fear at the time that Clay made the alleged attack in April, 1934, the jury might consider the testimony, and the instruction therefore does not correct the damage done.

■ II. The appellant also complains that the court did not instruct the jury that Mabel Davis was an accomplice.

The court gave instruction No. 23:

"If Mabel Davis voluntarily accompanied someone to the Folsom house on December 24, 1933, knowing that his purpose was to rob or murder the occupant thereof, or both, with the purpose of joining in the wrongful act or aiding and assisting in the commission thereof, or if after reaching the premises she became aware of criminal intention on the part of her companion and thereafter voluntarily joined with him in accomplishing his purpose or assisted or abetted him therein, she would be an accomplice in the eye of the law. On the other hand, if she went with him in ignorance of his purpose and intention, and with no criminal intent on her part, or was put in fear for her life if she refused to accompany him or to aid and assist him, and after reaching the premises did nothing to forward, aid or abet acts of her companion except what she was coerced into doing through fear of physical harm to herself as a result of the latter's conduct and demeanor, she would not be an accomplice."

We must turn to the record to see whether or not there was evidence that justified the giving of the instruction, or whether it was as a matter of law the duty of the court under this record to instruct the jury that Mabel Davis was an accomplice. In the case of State of Iowa v. Myers, reported in 207 Iowa 555, 223 N. W. 166, this court said:

" 'The general rule for determining whether a witness is an accomplice or not is to determine whether he could have been indicted and convicted of the same crime.' State v. Brundage, 200 Iowa 1394, 206 N. W. 607.

"We have no doubt that Glotfelty on his own testimony could have been indicted and convicted of the offense here charged. State v. Farris, 189 Iowa 505, 178 N. W. 361. Glotfelty was undoubtedly an accomplice. * * * There was corrob-

orating evidence, but the court nevertheless should have in-formed the jury of the necessity of corroboration under Section 13901, Code 1927, even though request for such an instruction was not made.''

Using this definition, as set out by this court in the above-cited case, was Mabel Davis an accomplice? She admits the following: She went on the night of December 24, 1933, with Louis Clay in his car to the southwest corner of the stadium on the west side of Iowa City where the automobile was parked. It was a cold night, the thermometer registering below zero, and yet she asked no questions about going riding and asked no questions when they stopped, parked the car, and got out of same. They walked across the field, then across the golf links, to the Folsom house, and when they approached the house she says Clay said to her, ''Knock at the door and tell him you want to get warm.'' Mabel says she did not ask any questions when Clay made this request of her, but immediately walked up on the back porch, knocked at the door, and gained admit-tance for herself and Louis Clay. When they got inside the door, Clay pulled a gun and said, ''It's a holdup.'' She watched the entire performance. When Clay was tying the hands of Folsom, Mabel Davis stood there, holding the gun which Clay had given to her. True, she says she did not point the gun at Folsom, but the gun was in her hands. She went with Folsom and Clay from the kitchen into the adjoining room, where Clay demanded the combination of the safe, opened and searched it. Mabel Davis stood there with the gun in her hand, watched Clay as he examined the various papers in the safe, described in detail the things which he took from the safe, certain bonds, which he did not want and which he put back into the safe, watched him as he counted the fifteen $1 bills which were taken. The jewelry and the trinkets were all examined by her. She went back to the kitchen with Folsom and Clay, stood there and watched Clay as he searched the cupboard and the book-case. She looked over the money which Clay found, examined the coins and the jewelry. She stood there as Clay, according to her story, choked Folsom. True, she says she protested, but she made no outcry. Neither did she make any effort to assist Folsom or to prevent Clay from doing what she claimed he did, although she had in her hands the gun that Clay had used in

holding up Folsom. She watched Clay as he put the block of wood between the door, as he cut the ropes from the hands of the old gentleman and burned them in the stove, and then together they left the house, walked back across the field and golf links to the hidden car, got in and rode back to town and stayed at Clay's mother's house that night. Mabel had the rings which came from the Folsom house and wore them at various times. At no time from December of 1933 until in August of 1934 did she tell any one of what she claimed took place on that Christmas Eve.

It is claimed that Mabel Davis was not an accomplice because she did what she did do in fear for her life; that if she did not accompany Clay and did not assist him as she did, her life would have been in danger, and she was coerced into doing these things through fear of physical harm. This was the theory of the lower court, and he so instructed the jury in giving instruction No. 23. If the record disclosed facts that would come under the latter part of the instruction, we would think it was correct, but from a careful reading of the record we find that in the direct examination of Mabel Davis, which covered the greater part of a long transcript, she was never asked whether or not Louis Clay threatened her or whether she feared him. There is no evidence in this record of any threats that Louis Clay made while he and Mabel were riding to the place where they parked the car. No threats while they were walking from the car to the house. No threats when he asked her to knock at the door and gain admittance to the Folsom home. No evidence of fear on her part which would prompt her to do the things that she testified she did. Not a single word of testimony that if Mabel did not do as he told her to do, on the night that she claims Folsom was murdered, he would injure her. Nor is there any evidence of any attacks made upon her other than the evidence set out of the one she claimed took place in Waukegan in April of 1934, whereas there is the uncontradicted evidence that Mabel was exceedingly friendly towards Louis Clay during that period of time; that he took her to Waukegan to her mother's house; that she wrote him the endearing letters, sent him the framed card and picture of herself with inscriptions thereon; and finally wrote him, urging him to come back to her at Waukegan. In view of the fact that there is no evidence to show threats on the part of Louis Clay, or fear on the part of Mabel Davis on the night of December 24,

1933, certainly these acts on her part would not justify the jury in finding if Mabel had not accompanied Louis Clay on that night, had she not knocked at the door and gained admittance to the house, had not stood there and held the gun, that she believed she would have suffered physical harm. The instruction which the court gave, to wit, No. 23, sets out:

"If she * * * was put in fear for her life if she refused to accompany him or to aid and assist him * * * she was coerced into doing through fear of physical harm to herself. * * *"

■■■ The courts in considering the question of fear, coercion, or duress as an excuse for crime have laid down the following rules:

In the case of People v. Repke, reported in 103 Mich. 459, 61 N.W. 861, at page 865, the Michigan court said:

"The general rule upon the subject of duress as an excuse for crime is laid down in Stephens' Digest of Criminal Law (article 31), as follows:

" 'An act which, if done willingly, would make a person a principal in the second degree, may be innocent if the crime is committed by a number of offenders, and if done only because, during the whole of the time in which it is being done, the person who does it is compelled to do it by threats on the part of the offenders instantly to kill him, or to do him grievous bodily harm if he refuses; but threats of future injury or the commanding of any one not the husband of the offender do not excuse any offense.'

"Lord Chief Justice Lee, in MacGrowther's Case, 18 State Tr., 394, which was a case of treason, the defense being duress and compulsion, said:

" 'The only force that doth excuse is the force upon the person and present fear of death; and this force and fear must continue all the time the party remains with the rebels.'

"Fears of future injuries do not excuse an offense. Whart. Cr. Law (9th Ed.) section 94. The necessity which will excuse a man for breach of law must be instant and imminent. Bish. Cr. Law (7th Ed.) section 352."

Again, in 16 C. J. p. 91, par. 59, we find this statement:

"An act which would otherwise constitute a crime may also

be excused on the ground that it was done under compulsion or duress. The compulsion which will excuse a criminal act, however, must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done. A threat of future injury is not enough. Such compulsion must have arisen without the negligence or fault of the person who insists upon it as a defense. * * *'' Ross v. State, 169 Ind. 388, 82 N. E. 781.

This record does not show that Mabel Davis was in fear for her life or in danger of great bodily harm at the time she proceeded on December 24, 1933, to accompany Louis Clay to the Folsom home. She was therefore not acting under fear, nor was she coerced into doing what she did do. The court erred in giving instruction No. 23 and should have instructed the jury that Mabel Davis was an accomplice.

Other questions are raised, but as the case must be retried, we will not at this time discuss them.

Judgment and decree of the lower court must be, and it is hereby, reversed and the case remanded.

KINTZINGER, C. J., and DONEGAN, PARSONS, HAMILTON, and RICHARDS, JJ., concur.

ALBERT and ANDERSON, JJ., dissent.