Argued June 5, affirmed September 6, 1962

# STATE OF OREGON *v.* ELLIS
374 P. 2d 461

*Elmer M. Amundson,* Salem, argued the cause and submitted the brief for appellant.

*Collis L. Marsters,* Deputy District Attorney, Salem, argued the cause for respondent. With him on the brief was Hattie J. Kremen, District Attorney for Marion County, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Arlie Day Ellis, from a judgment of the circuit court which adjudged him guilty of the crime of kidnapping (ORS 163.610) and imposed sentence. The defendant was one of three persons indicted for the crime. Since the other participants pleaded guilty, our only concern on this appeal is with Ellis.

ORS 163.610 provides:

"Every person who without lawful authority forcibly seizes and confines, inveigles or kidnaps another, with intent to cause such other person to be secretly confined or imprisoned in this state against his or her will, or to cause such other person to be sent out of the state against his or her will, shall be punished  *  *  *."

The indictment charged that the defendant:

"*  *  *  did then and there, without lawful, or any, authority, unlawfully, willfully, feloniously and forcibly seize, confine and kidnap another, to-wit: one Thomas A. Hedgecoke, in said county, with intent  *  *  *  unlawfully and feloniously to cause the said Thomas A. Hedgecoke, against

his will, to be secretly confined and imprisoned in the State of Oregon, contrary to * * *."

On the evening of February 20, 1961, the defendant Ellis and his co-defendants, Lawrence Morrow and Darlene Wood (an 18 year-old girl) were riding in an automobile operated by Morrow. They stopped at a service station in Salem where Morrow intended to purchase gasoline. When he noticed a state police car pull up directly behind him he drove out of the station without refueling and headed southerly at a high rate of speed. For some reason which is not divulged by the record Morrow preferred to avoid the police. Officer Hedgecoke, the driver of the police car, followed closely behind Morrow. A few miles south of Salem Morrow, realizing that he was almost out of fuel, stopped his car at the side of the road. Officer Hedgecoke stopped behind the Morrow car and ordered its occupants to get out. They complied. After having ordered Morrow and the girl to stand in front of the car, Hedgecoke proceeeded to frisk Ellis for weapons. While Hedgecoke was thus occupied the girl produced a pistol and pointed it directly at him telling him to "hold it right there." A few moments later Morrow took Darlene's pistol and trained it on the officer. Then Morrow relieved the officer of his pistol and handed it to the defendant Ellis, who immediately held it on the officer, apparently at Morrow's request. At that juncture Morrow ordered Officer Hedgecoke into the driver's seat of his (Morrow's) car. The defendant Ellis took a seat immediately behind the officer and for a while at least kept a gun pointed at him. Morrow and the girl sat in the front seat with the officer. Officer Hedgecoke, obedient to Morrow's order, put the car into movement. About this time the three alleged kidnappers spoke of driving

into California. Whatever may have been their plans as to their ultimate destination the officer drove the car at the command of Morrow, if not that of all three, along the country roads south of Salem until he was forced to slow down by a police barricade some twenty minutes later. Although the officer was ordered by Morrow to circumvent the road block, he stopped the car and, after jumping out, made a dash for cover.

The foregoing, apart from the confession to which we will presently proceed, is a synopsis of the evidence which bears upon the issue of kidnapping.

We will now review the evidence which bears upon the issue as to whether the confession was a voluntary utterance. When it became apparent that the state would undertake to establish that the defendant confessed his guilt, defendant's counsel made this objection:

"I would object to the admission of this evidence as not being a voluntary statement on the part of the defendant because of the type of treatment he reported just prior to the statement being taken. I feel that Sergeant Huffman was kind and gentle, but the kind of treatment just prior to that was not."

Sergeant Huffman, mentioned in the objection, was the police officer who received and transcribed on a typewriter the confession. The defendant signed it. It will be noticed that the objection described him as "kind and gentle." The defendant testified that the sergeant was fair and solicitous of his comfort. The defendant does not claim that any force or threats were employed by Sergeant Huffman or anyone else while he was telling the sergeant of his participation in the alleged kidnapping. He expressly acknowledged that no promise of any kind was made to him as an

inducement for him to speak. Since the confession was given in the evening of the alleged kidnapping and within an hour—possibly less—of the arrest, the rule which is employed by some courts that a confession which is obtained at a time when the defendant should be before a committing magistrate has no application to this case. There is no claim that the defendant lacked sleep. The hour when the confession was given was not late.

When defendant's counsel made the above quoted objection the trial judge excused the jurors and heard all the evidence which the state and the defendant offered upon the issue as to the confession's admissibility. At the close of the evidence the trial judge suggested that "some of the matter" in the typewritten confession should be removed from it. His suggestion was adopted and the matter was removed. The trial judge then ruled that the confession was admissible.

Since no one claims that the paper which the defendant signed does not constitute, if admissible, a confession of the crime charged in the indictment, we will speak of it as a confession.

The defendant makes no contention that any force, violence, promises or threats were employed by Sergeant Huffman. Nor does he claim that anything whatever occurred in the room where the sergeant interviewed him that affected the confession's admissibility. But the defendant claims that in events which occurred before he was interviewed by Sergeant Huffman he became fearful of the police. We will now take note of those events.

As Ellis, Morrow and the girl emerged from the car they were ordered to lie down on the ground with their hands stretched above their heads. While thus

prone they were handcuffed and searched by the state police officers who had stopped them. Ellis complains that the officers treated him rather roughly. The "rough" treatment consisted of pulling him up by the hair into a semi-standing position and of then letting him down only to pull him to his feet by the handcuffs. The prisoners were then placed in police cars and were taken to State Police headquarters in Salem. Morrow was immediately separated from the other two and did not see them again that evening. While Ellis and the girl were in the waiting room of the headquarters building an incident occurred which Ellis claims engendered in him fear of the officers.

Ellis claims that the incident just mentioned is important because a few minutes after it was over he was taken into another office of the police headquarters building where he was interviewed by Sergeant Huffman and shortly signed the confession. Ellis says that the incident made him fearful of police officers and that, therefore, the confession is inadmissible. According to him, while he and the girl were in the waiting room the girl "started to spout out, wising off. * * * She was boasting of herself; she called him very dirty names." By the pronoun "him" the defendant referred to one of the police officers. The captain of police, who was in charge of the headquarters office, in dealing with the situation just mentioned "back-handed me on the face and darned near knocked me down" so the defendant testified. He also described the captain's action in these words: "That is just about all I can remember right now. They pushed me in the chair and told me to sit down. * * * I don't remember saying nothing to anyone of the officers in that front room, except this one officer that told me to laugh which I did. I just

chuckled and he back-handed me and said something else which I don't remember."

Although the defendant described Sergeant Huffman as fair, kind and solicitous of his comfort, he said nothing to him about having been struck in the face while in the nearby waiting room.

Sergeant Huffman testified that he typed the defendant's statement "as he told it to me." We have mentioned the fact that the defendant makes no claim that anything was promised to him in order to induce him to speak, and that there was held out to him no hope of leniency. Sergeant Huffman likewise swore that no promises of any kind were made. We quote the following from the sergeant's testimony:

"Q Officer, at any time during the taking of the statement did the defendant show any attitude of not wanting to talk?

"A No, he was very cooperative and answered my questions quite friendly."

The defendant does not challenge that answer.

Captain Raymond G. Howard, the individual who the defendant says "back-handed me," denied that he had slapped the defendant. His words were: "No, sir, not a slap in the mouth. I pushed the defendant into a chair." He also testified that no officer slapped the defendant. He explained: "It is my best recollection the defendant was standing up and said 'dirty cocks' and I shoved him down and told him to shut up and as I pushed him down, it is my recollection I pushed him in the face when I pushed him down."

The foregoing discloses the nature of the incident which the defendant says rendered the confession, which he later gave, inadmissible. The incident did not occur in the room where the defendant was inter-

viewed by Sergeant Huffman. After the incident just described had taken place the defendant was taken into a nearby room where Sergeant Huffman spoke to him. A few minutes passed after the incident had taken place before the defendant spoke to the sergeant.

It was in the manner just described that Sergeant Huffman interviewed the defendant and typewrote the statements which the defendant made. When the statement had been completed Huffman gave the paper to Ellis to read. The defendant protested that he could read only with difficulty. As to what occurred, Sergeant Huffman testified as follows:

"* * * First he said he was a poor reader, but I told him to go ahead and read it out loud. I said, 'I have listened to a lot of poor readers.' And he read the first paragraph out loud, and he told me again he was a poor reader and it would take a little while, so I told him to take all the time he wished, that I wanted him to be sure and read the complete statement, so he sat there and started going through the statement."

The defendant did not contradict or challenge that testimony. Huffman further swore that it took the defendant thirty- to thirty-five minutes to go through the statement before he signed it. Ellis denies that it took him that long. He further claims that he did not read the statement beyond the first paragraph, and that he therefore was not aware of its contents. When he was asked why he signed it anyway, Ellis said, "I took it for granted that the officer made it out and put down what I said." The defendant pointed to nothing in the confession as contrary to what he had said to Huffman.

Five assignments of error are submitted by the

defendant. We will consider them in the order in which they appear in his brief.

■ First, the defendant claims that the trail court erred in overruling his objection to the admission in evidence of his typewritten, signed confession. The trial judge's holding that the confession was admissible was tantamount to a ruling that it was obtained without the influence of hope or fear and "will not be disturbed unless there is a clear and manifest error." *State v. Layton,* 174 Or 217, 148 P 2d 522 (1944); *State v. Linn,* 179 Or 499, 173 P 2d 305 (1946).

The defendant advances two reasons in support of his claim of error. First, it is urged that he confessed only because of a fear resulting from the "brutal treatment received at the hands of the police officers."

■■ In describing the conditions under which a confession may not be admitted in evidence, ORS 136.540 states, in part, as follows:

"(1) A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against him when it was made under the influence of fear produced by threats; nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed."

It will be noted that a confession, if it is to be deemed involuntary by reason of the inducements which preceded it, must be shown to be "produced by" such treatment or inducements. The treatment and the statement must stand to each other in the relation of cause and effect. 2 Chamberlayne on Evidence, p. 1892, Sec. 1489. In the absence of such a relationship it could not seriously be contended that the statement was "produced by" the treatment received. See also *State v. Nagel,* 185 Or 486, 202 P 2d 640 (1949);

*Taylor v. State,* 27 Okla Cr 165, 225 P 988 (1924); *Anderson v. State,* 133 Wis 601, 114 NW 112 (1913). It follows that a confession may be voluntary though made after violence used or threats made for a purpose other than to induce a confession. Thus, a confession would not be involuntary where the violence was used or threats made in order to effect an arrest or to enforce discipline in jail. *State v. Nagel,* supra. See also, 2 Underhill's Criminal Evidence, Sec. 389, p. 996.

In the Nagel case the defendant was charged with the crime of contributing to the delinquency of a minor. It was claimed that he had indecently exposed himself to the young daughter of Judge Vandenberg, circuit judge of the Thirteenth Judicial District. It was undisputed that during the defendant's detention at the police station in Klamath Falls Judge Vandenberg violently shoved him into a chair and several times threatened him with physical injury. To the defendant's claim that this severe treatment led to his subsequent confession this Court said:

"* * * For the most reasonable view of the evidence, in our opinion, and certainly the view that the trial judge was entitled to hold, is that Judge Vandenberg's conduct towards the defendant, which the latter claimed in his testimony put him in fear of his life, had nothing to do with an attempt to extort a confession from him, and did not produce that effect on the defendant's mind, but rather that it was provoked by the defendant's overtures to Judge Vandenberg looking toward a financial settlement of his difficulty. All the evidence except that of the defendant himself tends to support this conclusion * * *."

Defendant cites as examples of the "brutal" treatment to which he was subjected in the case at bar the

fact that he was forced to lie on the ground at the time of his arrest, that he was handcuffed in an uncomfortable position, that he was pulled by the hair, and was pulled to his feet by the handcuffs. Finally, he submits the slap in the face administered by Captain Howard. In order to evaluate the effect and the seriousness of these incidents it is necessary to view them in the perspective of all of the events of the evening.

It must be recalled that a short while before the incidents of which defendant complains occurred, he and his companions had been stopped by Officer Hedgecoke. Had the officer at that time forced them to lie on the ground and had he handcuffed them, he may have avoided being kidnapped. He had not done so because, in his words, "it was real cold" and he considered it unnecessary to subject them to this discomfort. The officers who shortly captured and searched the prisoners were aware of the threat to their fellow officer's life. It was reasonable for them to take the precautions available to them to avoid a recurrence of what had befallen him. They did what they thought was necessary to secure their prisoners. If the defendant was pulled up by his hair and handcuffs from his position of lying on the ground, he possibly realized that it was the officers' reaction to the indignity and danger to which he and his companions had subjected Officer Hedgecoke a few minutes previously. Morrow's testimony, when he was questioned as to the general treatment accorded Ellis by the officers at the time of his arrest, is enlightening:

"I can say, as a whole, they were fairly rough when we were first picked up. They shoved us around rather roughly, as I said. They did shove us or whatever have you. At the time I never

gave it a thought. They never laid hands on us other than to shove."

It appears that the treatment amounted to little more than shoving the prisoners around in a "fairly" rough manner. It was not rough enough to cause Morrow to give it "a thought." Under the circumstances it cannot be said that the treatment the prisoners received at the place of arrest was unduly rough. Nor can we discover any causal link between that treatment and the confession later offered by Ellis.

In his testimony regarding the trip to police headquarters and the incident which occurred there, the defendant Ellis said the following:

> "When we went to headquarters, the officers—there was two of them I was riding with and they seemed to be pretty nice. I don't know their names, but when we got there Darlene Wood started to spout off—I don't know how I should put it, and this one plainclothesman kicked her in the seat and then he walked over and told me to laugh, which I did, and he backhanded me on the face and darned near knocked me down."

Captain Howard was the plainclothesman to whom the defendant referred. We have already taken note of the testimony which discloses what occurred in the waiting room after abusive language was directed at the captain. We believe that the trial judge, in resolving the issue as to whether or not the confession was prima facie admissible, could properly deem that the police captain's act in "backhanding" Ellis was in response to the abusive language to which he had been subjected. His action was disciplinary in nature. It was in no sense intended to induce a confession. In the language of the Nagel case, Howard's action "had nothing to do with an attempt to extort a con-

fession from him, and did not produce that effect on the defendant's mind."

The defendant stresses the fact that Captain Howard was present in Sergeant Huffman's office during a part of the interrogation. He claims that the captain's presence there placed him in fear for his physical safety. He admits, however, that the captain was friendly and "nice" during the part of the time that he was in the room, and that no reference was made to the incident that had taken place a short time previously in the waiting room. We have read the defendant's testimony several times in an effort to find any utterance by him to the effect that Captain Howard's appearance in the interview room, or any other development that occurred that evening, caused him to confess or say anything except the truth. He nowhere testified that he confessed or said a false word to Sergeant Huffman because Captain Howard entered the room or because of anything that any police officer had done. We are not now concerned with the truthfulness of the confession but with the issue as to whether or not the confession was voluntary. We add, however, that the defendant nowhere claims that the confession contains a false word except its statement that he was advised of his right to counsel. He testified "they never told me anything about that." We notice, though, that immediately after speaking the quoted words he explained, "It was handed to me and told me to read it."

■ We are convinced that the only reasonable view of the evidence presented by the record is that nothing the officers did was calculated to obtain a confession from the defendant. Nor does the record afford us any basis to conclude that their actions were causally related to the confession, except the part played by

Sergeant Huffman. The defendant does not criticize anything that Huffman did.

■ Also in support of his first assignment of error the defendant contends that the confession was neither read to him nor by him and that, therefore, it cannot be considered voluntary notwithstanding the fact that it bears his signature. He seeks to derive authority for this proposition from the following excerpt from *State v. Folkes*, 174 Or 568, 150 P 2d 17 (1944):

> "Upon its face, exhibit K indicates that the defendant made a consistent, convincing and voluntary verbal confession of guilt, but that is not to say that the instrument itself is a confession. * * *"

However, the majority opinion in that case also said:

> "* * * If it were written by him or bore his signature, upon preliminary proof of its voluntary character, the instrument would have been admissible as a written confession, or if it had been shown to or read by him and had been acquiesced in by him as correct, the same result would follow. * * *"

It is undisputed that Ellis both saw and signed the confession. He admits that he read a part of it. He does not deny that he had ample opportunity to read the remainder and to have it explained to him if he so desired. By his signature he acquiesced in its correctness, 23 CJS, Criminal Law, § 833, page 238, to the extent of rendering it admissible. We find the defendant's first assignment of error without merit.

The second and third assignments of error contest the trial court's denial of both the defendant's motion to dismiss and his later motion for a directed verdict. Both motions were based on the contention that, in taking part in the kidnapping, Ellis acted under duress

and compulsion and that therefore the element of intent was lacking. The defendant concludes that in the absence of a showing of intent the state has failed to prove that he is guilty of the crime with which he has been charged.

■ To sustain his contention the defendant attempts to cast himself in the role of an unsuspecting and unwilling participant in the events which led up to the kidnapping. He claims that he assisted in the actual crime only because he was forced at gunpoint to do so. The following excerpt is taken from page 17 of his brief:

"* * * When the defendant Ellis stepped out of the car in which he was riding as a passenger, the police officer ordered him to place his hands upon the top of the car. At this point the defendant Wood pulled out a pistol and was pointing it both at the officer and at defendant Ellis. The defendant Morrow took the police officer's pistol and for a time had both guns in his hands pointing at the officer and in the direction of defendant Ellis. At this point he handed the police's revolver to defendant Ellis * * * and told him to hold it on the officer while he went back to the police car. The defendant's statement * * * was, 'And I looked, and she was pointing a gun at the officer and at myself, the way it looked.' * * *

"It is submitted to the Court that Ellis was functioning under fear of injury, not knowing what would happen next if he attempted to resist * * *."

In stating the applicable rule in *State v. Patterson,* 117 Or 153, 241 P 977 (1926), the Court quoted from 16 CJ 91 as follows:

"An act which would otherwise constitute a crime may also be excused on the ground that it was done under compulsion or duress. The com-

pulsion which will excuse a criminal act, however, must be present, iminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done. A threat of future injury is not enough. Such compulsion must have arisen without the fault of the person who insists upon it as a defense."

Fear of death or of bodily injury is not, of itself, enough. The fear must be a well grounded one. In order to determine whether the fear which defendant claims he experienced was well grounded it is again necessary to take into consideration the entire circumstances.

Both the defendant and Morrow swore that nobody compelled Ellis to accompany Morrow and Wood in Morrow's car on the evening the crime was committed. The testimony reveals that Morrow's attitude as to whether Ellis joined them was one of total indifference. There is nothing in the record which indicates that Ellis was in the car for any reason other than that he chose to be there.

The defendant places great emphasis on the fact that while Morrow was pointing the gun at Officer Hedgecoke he was also pointing in the general direction of the defendant. He concludes that this gun-waving, with the defendant in the general line of fire, engendered in the latter fear sufficient to cause him to assist in the kidnapping although he inwardly rebelled at the idea. The uncertainty and hesitancy of defendant's testimony affords but a weak basis for such a conclusion. We quote from his words:

"The revolver, the gun he had was pointed at me the bigger share of the time. This was going on until Larry [Morrow] took the—Larry took the

revolver from the officer. It was pointed toward me—at least it looked like that and I am pretty sure it was pointed in my direction—until he took the revolver from the officer and handed it to me. I am pretty sure, the nozzle first, the way it looked. I don't remember now, and he handed it to me and told me to hold it on the officer."

It is evident that he was not sure that the gun was at any time pointed in his direction.

Nor did Morrow's behaviour at that time or at any time during the course of the evening give the defendant cause to fear that he would resort to physical violence if the defendant did not comply with his requests. To the contrary, it has been shown that Morrow's attitude as to the defendant's participation was one of indifference. The defendant had no reason to believe that that attitude had changed. He had no reason to believe that his life was endangered.

In this connection it is significant that there is not the slightest indication in the record that Ellis at any time or in any way indicated a desire to escape from the dilemma into which he claims he had been thrust. The following is taken from the testimony of Officer Hedgecoke:

"Q Can you tell the jury, Officer, at any time from the time you came upon this trio, did the defendant Ellis ever ask them to stop what they were doing?

"A No, he did not. As a matter of fact, before they ever put me in the car I tried to talk them out of it. I told them they were getting in further trouble, to give up while they could. In fact I tried several times to talk them out of it, but to no avail. Nobody said a word. They were right and that was it.

"Q At any time, from the time you came upon the car and saw the defendant until you eventually jumped out of the car at the road block, did the defendant Ellis ever ask them to stop and desist from what they were doing?

"A No, he didn't.

*     *     *

"Q * * * from the time you came on this car until you left the car, did the defendant Ellis manifest or evidence any desire or wish on his part to leave the car, to get out of the car, to get out of the situation?

"A None whatsoever."

Far from disputing that evidence, the defendant's own testimony corroborates it. With all of his protestations of unwillingness to participate, and of duress and of threats, the defendant never once gave an indication, verbal or otherwise, of this state of mind to anyone until he testified at the trial.

■ The evidence points only to the conclusion that the defendant acted at all times as a free agent, and that any fears which he may have had as to Morrow's intentions were not well grounded. It indicates that the defendant Ellis, as well as his companions, consciously chose this course of action because they at that time believed it to be the most effective means of evading arrest. We conclude that the jury was entitled to find in the actions of the defendant the element of intent to commit the crime of kidnapping. The motions to dismiss were properly denied.

In his fourth assignment of error the defendant urges that the circuit court improperly denied his motion for a new trial. He rests his contention on three subsections of ORS 17.610, which specifies the

conditions under which a new trial may be granted. They are as follows:

> "(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial.
>
> \* \* \*
>
> "(4) Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial.
>
> \* \* \*
>
> "(7) Error in law occurring at the trial, and excepted to by the party making the application."

As an error under subsection (1) defendant claims that it was an abuse of the trial court's discretion to admit his typewritten, signed confession in evidence. In view of our disposition of his first assignment of error, supra, we find no merit in this contention.

■■ The defendant's motion for a new trial was accompanied with an affidavit which revealed the "new evidence" which the defendant argues entitled him to a new trial under subsection (4), above. The qualities which newly discovered evidence must possess in order to justify the grant of a new trial are set forth in *State v. Davis*, 192 Or 575, 235 P 2d 761 (1951). It must (1) be such as will probably change the result if a new trial is granted, (2) have been discovered since the trial, (3) be such as, with due diligence, could not have been discovered before the trial, (4) be material to the issue, (5) not be merely cumulative, and (6) not be merely impeaching or contradicting of former evidence. Applications for a new trial on the ground of newly discovered evidence are not favored. They are viewed with distrust and are construed with strictness. *State v. Davis*, supra.

■ One item of defendant's new evidence is a statement written by Officer Hedgecoke prior to the trial which allegedly differs from his testimony in court that the defendant at one point on the evening of February 20, 1961, asked Morrow, "Shall we kill him now?" Defendant concedes that the statement is merely impeaching or contradictory of former evidence. That alone disqualifies it as a basis for a new trial under the rule of the Davis case. In addition, it is highly improbable that its admission would make any difference in the ultimate result. The evidence establishes the defendant's willful participation in the crime even if it be assumed that he did not make the disputed statement.

The other evidence which the defendant offers concerns reading comprehension tests which were administered to defendant after the trial. Defense counsel does no more than allege that he, himself, could not have discovered his client's lack of reading skill prior to the trial. He offers no explanation for that situation. Sergeant Huffman had been apprized of the fact on the night the confession was taken. Defendant's mother, as one of his witnesses, testified at the trial that she had known for years that her son was a poor reader, and that this had affected his academic progress. Yet counsel claims that he first became aware of his client's deficiency at the trial. We are satisfied that with due diligence he could have discovered the fact prior to the trial. No reason appears why, in the exercise of due diligence, the tests could not have been taken during the two months between the defendant's arrest and his trial. This new evidence also fails under the rule of the Davis case to establish a basis for a new trial.

■ Defendant claims that the trial court made an

error of law by not submitting the question of the voluntariness of the confession to the jury, and that a new trial should be ordered under ORS 17.610 (7), quoted above. The defendant made no request that the voluntary character of his confession should be submitted to the jury.

A preceding paragraph of this opinion gives a synopsis of the testimony which was given by the state and the defendant in the absence of the jury and before the trial judge only upon the issue as to the voluntary character of the confession. It will be recalled that the defendant, in the hearing before the judge, depended heavily upon the so-called "back-handed" incident that occurred in the waiting room of the police headquarters a few minutes before he was interrogated by Sergeant Huffman. The testimony that was taken before the trial judge (in the absence of the jury) was not repeated to the jury. The defendant made no request to that effect. When the defendant testified before the jury he said nothing whatever about the "back-handed" incident. The only part of his testimony before the jury which possibly related to mistreatment was his mention of the incident of the arrest. He there said:

"* * * put handcuffs on our wrists and started pulling me up by my hair first and then he let me back down again and grabbed hold between my handcuffs and pulled me up by my handcuffs."

That was all that he said. He did not claim that the incident created in him any fear.

The defendant testified that he made and signed a statement before Sergeant Huffman. He did not claim that Captain Howard entered the room, nor did he

mention Captain Howard at all. He claimed that he had not read the statement that Sergeant Huffman typed, but made no claim that he was a poor reader, nor did he offer any other explanation for his purported failure to have read the statement that Sergeant Huffman typed. We now quote from his testimony:

"Q  I am going to ask you if it isn't a fact that after Sergeant Huffman finished typing the statement he handed it to you and made you read it, the very first paragraph out loud?
"A  I don't remember, sir.

"Q  Are you saying that you did not?
"A  I don't remember, sir. I couldn't say if I did or didn't.

"Q  I will ask you, Mr. Ellis, if it isn't a fact that Sergeant Wayne Huffman handed you that statement and made you read it out loud, he told you to take your time and read every word, and you replied in substance, 'Mr. Sergeant Huffman' or whatever you called him, 'I am a slow reader and it will take a long time to read it.' And he said to take your time, all the time you need to read it.
"A  I don't remember if he said that or not, sir.

"Q  I will ask you if it isn't a fact you did read it and you took some 40 minutes to read it?
"A  No.

"Q  You deny that?
"A  I deny it.

"Q  That is all."

ORS 17.610 (7) which the defendant seeks to apply in this instance is limited by its own terms to cases in which the party making a motion for a new trial excepted to the alleged error at the trial. The defendant took no exception whatever to the instructions to the jury which were given by the court. Therefore, the section does not apply. The trial court properly

refused to grant a new trial. The defendant's fourth assignment of error is without merit.

The fifth assignment of error charges that the trial judge erred in not stating to the jury the qualities which a confession must possess to be admissible. The defendant requested no instruction upon that phase of the case. In truth, he requested no instructions of any kind.

Our statutes clearly indicate that instructions to the jury are reviewable by this Court only if the error complained of was excepted to in the trial court. That mandate, found in ORS 17.510, is as follows:

"No instruction given to a jury in the circuit court shall be subject to review upon appeal unless its error, if any, was pointed out to the judge who gave it and unless a notation of an exception was made in the circuit court. * * *"

See *State v. Avent,* 209 Or 181, 302 P 2d 549 (1956).

It is also well settled that it is not reversible error for the court to fail to instruct a jury on a particular point unless a proper instruction has been requested. *State v. Gray,* 212 Or 175, 318 P 2d 570 (1957). See also *State v. Nodine,* 198 Or 679, 259 P 2d 1056 (1953).

It is evident that review of the trial judge's instructions by this Court must be preceded by a request for instructions. The defendant Ellis asked for none.

We fail to find in the evidence which was submitted to the jury any indication that the defendant wished the jury to be instructed upon the admissibility of the confession. Evidently, he was satisfied with the manner in which the conscientious trial judge had resolved the issue; and therefore, did not resubmit the evidence upon that score to the jury. This assignment of error is without merit.

Judgment affirmed.