Argued and submitted June 3, affirmed November 17, 1993, reconsideration denied January 19, petition for review denied February 8, 1994 (318 Or 351)

# STATE OF OREGON,
*Respondent,*

*v.*

# DEBRA LYNN BOCKORNY,
*Appellant.*

(C89-10-35769, C90-08-34880;
CA A70018 (Control), A70019)
(Cases Consolidated)

863 P2d 1296

Laura Graser argued the cause and filed the brief for appellant.

Robert B. Rocklin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Janet A. Metcalf, Assistant Attorney General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Defendant was convicted of five counts of aggravated murder and one count of murder after she and her husband, Randy Bockorny, were tried separately for the homicide of Deborah Spicer. ORS 163.115; ORS 163.095. The aggravated murder counts alleged underlying crimes of sexual abuse, sodomy, aiding and abetting in committing sexual abuse and killing the victim in an effort to conceal the commission of sexual abuse. ORS 163.115(1)(b). The jury sentenced defendant to life without the possibility of parole. We affirm.

Defendant and Randy met Spicer during a day of heavy drinking. The three went to defendant's residence where Randy told the two women to have sex together. During the sexual encounter, defendant stabbed Spicer. Defendant then left the room, and, after Randy later joined her, defendant saw that Spicer was dead. She had been strangled. The stab wounds were not fatal, but the loss of blood made the victim more susceptible to asphyxiation. Defendant and Randy put Spicer's body in their van and then threw the body over an embankment at the side of a road. They were arrested in Wisconsin about two weeks later.

Defendant never denied her participation in the homicide, but offered the defense of duress. She claimed that Randy terrorized her and compelled her to commit the underlying crimes that made the case aggravated murder. She testified about Randy's violence towards her, including, *inter alia*, that on different occasions he had broken her nose, blackened her eyes, threatened to kill her and assaulted her sexually.

In her first two assignments of error, defendant argues that the trial court erred during the guilt phase of the trial by excluding evidence about Randy's bad acts and prior convictions, which, she argues, would have been corroborative evidence of his violent nature. Specifically, defendant sought to admit evidence about a homicide that Randy told her he had committed but for which he was never charged, testimony by a former girlfriend about Randy's abuse of her and a police officer's observation of Randy's violent and "scary" demeanor. Defendant also sought to admit evidence that Randy had been convicted for property damage, escape,

assault by a prisoner, a parole violation and for Spicer's murder. The trial court excluded the evidence from the former girlfriend as irrelevant character evidence under OEC 404(3),[1] and excluded the other evidence on the ground that it was not relevant to defendant's defense of duress.

The state argues that there was no error, because defendant was not entitled to a duress defense. It contends that ORS 161.270 does not allow a defense of duress in a prosecution for murder and, under ORS 163.115(1)(b), murder includes felony murder. Defendant argues that the defense is available for the underlying felonies to aggravated murder. Assuming, without deciding, that defendant is correct, we agree with the state the trial court did not err in excluding the evidence.

Defendant argues that character evidence is admissible under OEC 404(1) if it is "an essential element" of the defendant's defense. The gravamen of her argument is that Randy's character was an essential element of her defense of duress because she had to show that her fear of him was reasonable. She contends that all of the excluded evidence would have demonstrated that her fear was justified and, thus, it was relevant.

ORS 161.270(1) provides:

"The commission of acts which would otherwise constitute an offense, other than murder, is not criminal if the actor engaged in the proscribed conduct because the actor was coerced to do so by the use or threatened use of unlawful physical force upon the actor or a third person, which force or threatened force was of such nature or degree to overcome earnest resistance."

As authority for her position that she was entitled to show everything she could about Randy's violent character in order to demonstrate that her fear was justified, defendant relies on *State v. Ellis*, 232 Or 70, 86, 374 P2d 461 (1962):

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"Fear of death or of bodily injury is not, of itself, enough. The fear must be a well grounded one. In order to determine whether the fear which defendant claims he experienced was well grounded it is again necessary to take into consideration the entire circumstances."

■　We do not agree that "consideration of the entire circumstances" means circumstances outside of the immediate ones addressed in ORS 161.270. Under that statute, defendant had to show that she had engaged in the underlying crimes because Randy forced her to do so by threatening unlawful physical force on her or Spicer with a degree of force so great that it overcame her earnest resistance. Randy's violent relationship with a former girlfriend, his past convictions and his prior bad acts were not relevant or essential to showing that, at the time she committed her criminal acts, she was compelled to do so. The court did not err in refusing to admit the evidence.

■　Defendant next assigns error to the admission of testimony, during rebuttal, from the state's expert psychiatrist, Colbach. Defendant called Gonsalves, a psychologist, who testified that he had interviewed defendant for three and one-half hours and had read some of the police reports. His conclusion was that defendant suffered from battered women's syndrome and post-traumatic stress disorder. On cross-examination, the prosecutor asked Gonsalves:

"Q.　In making your mental health evaluation, isn't it important for you to determine whether or not the person that you're evaluating is telling you the truth?

"A.　That's right.

"Q.　And don't you think that in determining whether somebody's telling the truth, that their ability to recount details of a crime is a significant factor as to whether or not they are truthful to you?

"A.　In my opinion, [defendant's] ability to recount the details in a truthful consistent manner around the crime satisfied me."

In rebuttal, Colbach testified that he had read the police reports and performed a psychiatric evaluation of defendant. He also testified that the background and history of the person he is evaluating are important. The questioning continued:

"Q. [By Prosecutor]: How important is it when somebody's talking to tell the truth to you?

"[Defense Counsel]: I'm going to object to this, Your Honor.

"The Court: The objection's overruled.

"(To Witness) Please answer, Doctor.

"The Witness: Well, obviously, it's important that people tell the truth because a lot of times what you have to go on is what the people say happened.

"Q. [By Prosecutor]: That includes the event?

"A. Yes. I mean, I'm not sure what you're asking. Obviously, everybody would like people to tell the truth. That's how you understand what happened.

"Now, if you're asking me whether I expect people to tell me the truth, that's an entirely —

"Q. Do you expect people to tell you the truth?

"A. No, especially in the jail.

"Q. Why?

"A. Well, most of them, that is an antisocial person which simply means that by nature, they —

"[Defense Counsel]: I'm going to object. This is not specific to the defendant.

"The Court: The objection's overruled.

"(To Witness) You may continue, Doctor.

"The Witness: Well, again, probably the distinction in the criminal population is what we psychiatrists call antisocial personality, and that just means somebody who has a different set of values, a different conscience, and these people lie and cheat and con, I mean, that's what it's all about. So I'm not so foolish to think that when they talk to me, people, especially about things that are important like how much time are they going to spend in prison, they're going to be honest with me. I just accept the fact that most of us present our best foot forward, right?

"You know, we apply for a job, you expand the last job so all of us color our lives a little bit. This group of people really color their lives and I just expect that. I don't get mad at them or anything. I just accept that this is the way they are and I try always to be looking at what evidence do I have about what really happened from other people, from witnesses,

who also lie. It's hard. You just have to put everything together.

"Q. [By Prosecutor]: If, hypothetically, a person tells you one story at date one, a month later starts changing the story, and four months later changes it again, is that something that is typical or something that is not?

"A. You hear the story change. I use a phrase called internal consistency. All that means, every time you hear the story, it's the same. Every time I hear something, I get some internal consistency from people, but I also get a lot of internal inconsistency, meaning the story changes.

"Q. Is there a time when you feel more comfortable with a story? In other words, the more time a person has, the less time a person has?

"A. I think you get a better story right after the person's been arrested, and with time, the story changes.

"[Defense Counsel]: I'm going to object, Your Honor. I think the area we're getting into, Your Honor, is opinions about truthfulness which are inadmissible.

"The Court: I understand your opinion, counsel. Your objection's overruled.

"Please continue.

"The Witness: Well, it's just been my observation that the longer people are in the system, criminal justice system, the more they work over their story. I'm not sure whether it's conscious or unconscious, but it seems to change. I've noticed that the times I've been able to interview people very close to the crime, it's a more accurate picture but not always, but there's a tendency to get a more accurate picture."

Defendant argues that the jury knew that she had been in custody for 18 months. She contends that Colbach's testimony was thus tantamount to telling the jury that she had lied when she told her story to him and also when she testified to the jury.

The Supreme Court has been emphatic that "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). It is true that Colbach's testimony could have tended to show that defendant was not truthful. However, the existence of that possibility

does not mean that the testimony was inadmissible. In *Middleton*, both the state and the defense called expert witnesses to testify about the "typical response" of a rape victim and about whether the victim's inconsistent statements about who had raped her were typical. The Supreme Court held that the testimony was admissible:

> "Neither of the experts directly expressed an opinion on the truth of the victim's testimony. Much expert testimony will tend to show that another witness either is or is not telling the truth. *See State v. Stringer*, 292 Or 388, 639 P2d 1264 (1982). This, by itself, will not render evidence inadmissible." 294 Or at 435.

Gonsalves' testimony that defendant suffered from battered women's syndrome and post-traumatic stress disorder was based in large part on his interview with her. The prosecutor was entitled to attack the basis of Gonsalves' expert opinion. After Gonsalves volunteered that he was satisfied that defendant had been truthful with him about the crime, the prosecutor was entitled to try to create doubt about that conclusion, as part of his attack on Gonsalves' expert opinion. Colbach's testimony about the characteristics of jail inmates, in relating the details of their crimes and the need for an expert to independently verify those details, attacked the foundation of Gonsalves' expert opinion. Colbach made no direct comments about the credibility of defendant, and it was not error to admit the testimony.

Defendant argues, however, that the purpose of Colbach's testimony was made evident when, during closing arguments, the prosecutor reminded the jury that Colbach's opinion was that defendant was not truthful. We agree with the state that the prosecutor's closing argument is not determinative of whether Colbach's testimony was inadmissible. The prosecutor was free to argue reasons why the jury should reject Gonsalves' psychological diagnosis. Even if his argument went beyond telling the jury how it should evaluate the evidence, defendant failed to object to the statement.

Defendant next contends that the court erred during the penalty phase of the trial in permitting the prosecutor to argue that the jury that convicted Randy concluded that defendant had committed the homicide. At the start of the

penalty phase, defendant offered as evidence Randy's judgment of conviction and sentence. In the course of his closing argument, defense counsel argued:

> "Stripped, beate[n], sexually abused, stabbed, and strangled? Those things all occurred, but as I told you at the outset, we don't know which facts there you felt were more Randy's doing than [defendant's]. You may have found her just as an aider and abettor alone, that was sufficient to find her guilty of intentional murder and personally getting involved in the murder the way you did." (Emphasis supplied.)

Counsel also asked the jury to consider the fact that Randy had received the minimum sentence when determining the appropriate penalty for defendant.

During the prosecutor's rebuttal, the following exchange occurred:

> "The defense would point to Randy Bockorny, and I want to talk about, you know, that in the first, in the trial of Randy Bockorny, the jury in that case gave Randy Bockorny the minimum sentence, * * * yes, they did that. You can't speculate. You're going to have these judgment rolls, though, and on these judgment rolls is going to indicate the offenses that he was found guilty of. In fact, he was found guilty of Count I, Felony Murder, the lesser included charge.

> "You indicate, you know, you found the defendant guilty, this defendant guilty of one lesser included charge, but it indicates the jury's answer to these four questions, and it will indicate here what those answers were.

> "And, of course, we don't know whether there was one juror or 10 jurors. We simply don't know that. But they were asked, 'Was the conduct of the defendant deliberate?' And after they heard his case, they said no. And when we asked about the probability of him committing future acts of violence, their verdict was no.

> "And should he receive the death penalty, the answer was no.

> "Now, there can be a whole variety of reasons for that verdict including — and it's speculation — including that the first —

> "[Defense Counsel]: Objection, Your Honor. He is asking them to speculate.

"[The Prosecutor]: I'm going through the possibilities, Your Honor, to that first verdict.

"The Court: Proceed.

"[The Prosecutor]: *What that jury concluded was that it was [defendant] who had committed this murder.*

"Now, you're going to have Randy Bockorny's record because you're going to have to judge yourself why did they come back, not a probability he'd commit future acts of violence. It is a mitigating circumstance you may consider.

"You don't have to, but let me ask you this question: What if the first jury had found Randy Bockorny not guilty? How would that affect you? Would you say, 'Well, he was found not guilty, and maybe we made a mistake? Maybe it's just the lesser sentence?' That's one thing that could happen.

"Second thing, what if they had given Randy Bockorny the death penalty? Would [Defense Counsel] be in here saying, 'Well, now, wait a minute. They may have given him the death penalty, but don't you give my client the death penalty.' " (Emphasis supplied.)

As a preliminary matter, the state argues that defendant did not "properly challenge" the prosecutor's closing argument, because defense counsel's only objection was in the middle of the prosecutor's statement, and counsel did not move to strike the argument or move for a mistrial. However, the objection was immediate and alerted the trial court that defendant believed that the prosecutor was inviting the jury to speculate. The prosecutor's response, that he was "going through the possibilities," indicated his position that he intended to explore what might have been the reason for the jury's verdict. The court told the prosecutor to proceed. The court's ruling showed defendant that it did not find objectionable the prosecutor's line of argument. Defendant did all that was required under the circumstances. *See State v. Lundbom*, 96 Or App 458, 773 P2d 11, *rev den* 308 Or 382 (1989).

A trial court has broad discretion in the control of the arguments of counsel in the penalty phase, as well as the guilt phase, of a capital case. Even if a prosecutor's statements are improper, tasteless or inappropriate, there is no abuse of discretion unless the effect is to deny a defendant a fair trial. *See State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990).

Defendant claims that the statement emphasized in the passage quoted above denied her a fair trial on the penalty, because it unequivocally declares that Randy's jury had concluded that defendant committed the murder. When the statement is considered in context, however, it is clear that the prosecutor was not making a definitive statement about the jury's verdict in Randy's case. Rather, he was explaining the possible ways in which defendant's jury could interpret that verdict.

Contrary to defendant's assertions, the prosecutor's statement does not imply that there were special facts about which the prosecutor had knowledge, nor does it suggest that he was especially adept at evaluating jury verdicts. Additionally, the statement cannot be construed as resulting from improper speculation about the basis of Randy's jury verdict. The statement is an argument to the jury that defendant committed the murder and that she should not be given the minimum sentence just because Randy was.

Indeed, in making the statement, it appears that the prosecutor was responding to the similar arguments made by defense counsel. By introducing the judgment into evidence and directing the jury's attention to the minimum sentence Randy received, defense counsel suggested that the jury might want to base its decision regarding defendant's punishment on what Randy's jury had determined was an appropriate penalty for him. Having argued to the jury that Randy's minimum sentence could be considered in deciding the extent of defendant's culpability, defense counsel could not then seek to prevent the prosecution from explaining the possible reasons why Randy may have received that sentence.

We also find it significant that the prosecutor stressed to the jury that defendant's punishment should be based solely on the evidence presented in the penalty phase:

"[W]hat I'm trying to say to you is that the first jury heard different things about [Randy's] past. They heard different things about [Randy], and you don't know what they are. They heard different evidence at the trial, and you don't know what it is.

"And sure, you can consider [Randy's minimum sentence], but as [a prosecutor] said, if you're just going to go off or say the law was, just would say just because he received the

lesser penalty, and that's it, there would be no reason to be going through this particular penalty phase.

"But this is, we look at the individual. We look at what the individual's done. And in this case, this particular individual has been very, very, very violent."

Those admonitions encouraged the jury to decide defendant's punishment on the basis of the evidence before it and not on what Randy's jury may or may not have concluded. They reduce the likelihood that one statement would have caused the jury to decide defendant's penalty on an improper basis. The prosecutor's statement did not deny defendant a fair trial, and the trial court did not abuse its discretion in permitting the prosecutor to proceed with his closing argument.

Defendant next argues that her sentence of life without parole offends a number of provisions of the Oregon and United States Constitutions. ORS 163.150 provides, in part:

"(1)(a) Upon a finding that the defendant is guilty of aggravated murder, the court * * * shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death. * * *

"* * * * *

"(2)(a) Upon the conclusion of the presentation of the evidence, * * * the trial court shall sentence the defendant to life imprisonment without the possibility of release or parole as described in ORS 163.105(1)(b), unless 10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment in which case the trial court shall sentence the defendant to life imprisonment as described in ORS 163.105(1)(c)."

Under ORS 163.105(1)(c) and (2), if mitigating circumstances exist, the defendant shall receive a minimum sentence of 30 years and can be considered for parole after 20 years. Here, nine members of the jury voted to give defendant a possibility for parole.

Defendant's constitutional challenges to her "true life" sentence were first raised in her motion in arrest of judgment, which the court denied. The state argues that none of her constitutional claims is preserved for appellate review,

because the claims may not be raised in a motion in arrest of judgment. We agree with the state.

■■    Under ORS 136.500, a motion in arrest of judgment "may be founded on either or both of the grounds specified in ORS 135.630(1) and (4), and not otherwise." ORS 135.630, as relevant, provides:

> "The defendant may demur to the accusatory instrument when it appears upon the face thereof:

> "(1)  If the accusatory instrument is an indictment, that the grand jury by which it was found had no legal authority to inquire into the crime charged because the same is not triable within the county;

> "* * * * *

> "(4)  That the facts stated do not constitute an offense[.]"

Thus, the only claims on which a motion in arrest of judgment can be based are an absence of authority by the grand jury or the charging instrument's failure to state facts constituting a crime. *State v. Foster*, 229 Or 293, 299, 366 P2d 896 (1961). The constitutional claims that defendant raised in her motion and that she argues on appeal are attacks on the validity of her sentence and have nothing to do with the legal authority of the grand jury that indicted her or the language of the charges set forth in the indictment. Defendant's constitutional challenges to her "true life" sentence were not properly preserved for appellate review, and we decline to consider them.

Defendant's final two assignments of error are directed at the court's denial of her demurrer to the indictment. She contends that the counts alleging attempted or actual sexual abuse as the aggravating factor were unconstitutionally and statutorily vague and that attempted sexual abuse could not be an aggravating factor, as that offense is a misdemeanor. However, she concedes that her arguments have been decided against her in *State v. Rogers*, 313 Or 356, 836 P2d 1308 (1992), *cert den* ___ US ___, 113 S Ct 1420 (1993).

Affirmed.