## Commonwealth v. Reffitt.

(Decided June 21, 1912.)

### Appeal from Montgomery Circuit Court.

1. Pooling Contract—Selling Pooled Tobacco—Prosecution for.—In a prosecution for the sale of pooled tobacco, the defense being that he pooled it as a result of threats, and that he believed should he do otherwise he would suffer loss of it, or injury to himself, it was the province of the jury to say whether or not, upon such evidence, appellee had been forced to sign the pooling contract under such belief.

2. Same—Evidence.—The evidence complained of was not hearsay, but competent substantive testimony, the object of it being to show that the pooling was not a free and voluntary act.

3. Pooling Contract—Threats of Violence.—It is not necessary that the threats complained of were committed by the society, but it is sufficient if they were made by those interested in the society for the supposed purpose of furthering its interests. Where the contract has been obtained by threats of personal violence, the society is in no position in good conscience and fair dealing to ask that it be enforced.

4. Instructions.—An instruction defining duress to mean such violence or threats by the society, or by persons acting for it, as were calculated to inspire a just fear of great injury to person, reputation or property, was correct.

JAMES BREATHITT, ex-Attorney General, THOS. B. McGREGOR, ex-Assistant Attorney General and JAMES GARNETT, Attorney General for appellant.

LEWIS APPERSON, JOHN A. JUDY for appellee.

. OPINION OF THE COURT BY JUDGE LASSING—Affirming.

On the 25th of September, 1909, James Reffitt pooled his tobacco, consisting of some five and a half acres, with the Nicholas County Board of Control. Afterward, he hauled this same tobacco to Mt. Sterling and sold it. At the April term following, he was indicted by the grand jury of Montgomery county, under section 3941a, of the Kentucky Statutes, upon a charge of selling pooled tobacco. At the September term of court, he was tried and found, not guilty. The Commonwealth, conceiving that his acquittal was due to errors committed by the trial court, in the introduction of evidence and the instructions given, has prosecuted an appeal, with the view of having the law settled.

Appellee admitted signing the contract, but alleged that he was compelled to do so under the beilef that his failure or refusal to enter into it would result in his suffering bodily harm or having his property destroyed. The evidence complained of was that to the effect that night riding had been going on in Nicholas county, plant beds destroyed, the canvas over them torn up and arranged over the center of the bed in the shape of a coffin or grave; people had been taken from their homes and whipped; one man in that county had been called to his door at night and killed; that barns had been burned and personal property destroyed, in cases where the owners of tobacco had refused to join the society and pool their crops, or had taken positions antagonistic to the society. It is common knowledge that shortly after the organization of the Society of Equity, a highly excited condition prevailed throughout the tobacco growing belt; the civil authorities were, in many instances, wholly unable to preserve the peace and prevent acts of violence and lawlessness and the destruction of property; that the local authorities, even when supplemented by the aid of the entire military power of the State, were still unable to restore order and prevent the perpetration of gross outrages upon the persons of individuals, who were antagonistic to the success of the society, and the destruction of their property. In the rarest instances, those subjected to such indignities or the loss of their property. were able to identify the persons guilty of these outrages, for they usually came upon their intended victims in the night time, and were so masked or

disguised as to render their identity impossible of detection.

As only those who were opposed to the society or had refused to join it were subjected to such treatment, it was generally understood that these punishments, so inflicted, were brought about by a lawless element in sympathy with the society, if not the members of it.

Appellee had heard these outrages discussed with frequency in that locality. He was not a member of the Society of Equity, did not want to become such, but was in constant dread that some injury would be done him or his crop would be destroyed. He testified that, while he was engaged in cutting his tobacco, a man named Blount came to him and told him that he would be in danger if he did not pool, and shortly thereafter, upon an occasion when he visited a blacksmith shop in the neighborhood to have some work done, a prominent Equity man said to him, in response to the question, had he pooled his tobacco, "Why don't you?" to which he gave an evasive answer, whereupon this man said "The best thing you can do, by God, is to pool your tobacco." He testified that these statements, coming to him in the way and at the time they did, when taken in connection with the general knowledge of conditions existing throughout the tobacco growing belt, caused him to sign the contract pooling this tobacco. He was a poor man, a tenant. This crop of tobacco represented his year's work; it was not in condition to sell at that time, only a part of it being in the house. In this condition, he found himself at the time that the advice from the Equity man, which he construed as a threat, was given him to pool. Under these circumstances, it was the province of the jury to say whether or not, in signing the contract, he had been forced to do so under the belief that any other course on his part would result, either in the loss of his property or personal injury to himself. The evidence complained of was not hearsay, but competent, substantive evidence, tending to show, and introduced for that purpose, not the truth or falsity of the reported outrages committed by night riders throughout the tobacco belt, but the fact that it was currently reported, that such outrages had been committed. The object of all this evidence on the part of appellee was to show that the contract pooling his tobacco was not his free and voluntary act. His fear that the failure on his part to pool would result in the loss of his property or personal injury, was superinduced and

brought about in the main, by the circulation of these re-
ports of punishment inflicted upon non-poolers in other
localities in the tobacco belt. The evidence merely went
to the effect that it was reported and understood that
such outrages had been committed. It was these reports,
according to appellee's contention, that exercised a con-
trolling influence over his mind and caused him to pool
his tobacco, and, in order to make out his defense, it
was incumbent upon him to show that such reports were
current. The evidence introduced by him tended to
establish this fact, and for this purpose was entirely
competent. In 1 Greenleaf's Evidence, 16 Ed., sec. 101,
in dealing with evidence of this character, the author
says:

"Upon the same principle, it is considered that evi-
dence of general reputation, reputed ownership, public
rumor, general notoriety, and the like, though composed
of the speech of third persons not under oath, is original
evidence, and not heresay, so far as it is offered, not to
prove the fact reputed to be true, but merely the prob-
ability that through the reputation, rumor, or other com-
munication a party has become aware of a certain fact
if it existed; whether in fact such information was or
was not correct is immaterial for the purpose of deter-
mining its admissibility; and hence it is no objection to
its admission that it was not given under the sanction
of an oath or that the opposite party had not the oppor-
tunity of cross examining the informant * * * such
evidence is admitted merely for the purpose of establish-
ing the utterance of the words, and not their truth."

All of this evidence, which was in fact but a matter
of current history, was competent for the purpose of
establishing the current rumors relative to the night
rider outrages in the tobacco belt.

This brings us to a consideration of the next point
raised by appellant, to-wit: that even though it be con-
ceded that the statements alleged to have been made by
Blount and the Equity man be construed to be a threat to
destroy appellee's property if he did not pool, that
nevertheless such a threat does not constitute duress
within the meaning of the term as usually understood,
and that the instruction given by the court upon this
point was erroneous. The instruction complained of is as
follows:

"By the term duress as used in this instruction is
meant such violence or threats made by the Burley To-

bacco Society or the Nicholas County Board of Control, or persons acting for or through them, or by their advice and counsel, as are calculated to operate on a person of ordinary firmness and inspire a just fear of great injury, to person, reputation or property, and if the jury believe from the evidence that the defendant signed the writing referred to in the first instruction under duress, they will find him not guilty."

It is urged that there was no evidence conducing to show that the Nicholas County Board of Control or the Burley Society were guilty of any acts of violence or unlawfulness, or were threatening the destruction of property or the injury of people through the instrumentality of night riders. It is true that the evidence does not show that the Burley Society or the Nicholas County Board of Control, neither of which institutions could speak except through their orders, entered upon the minutes of their meetings, authorized or directed anyone to resort to these means in order to further the interests of the society, but the communications received by appellee and which inspired in him the feeling of fear that resulted in his signing the contract were made by those interested in the society, by Equity men; and every man who joined the society became at once a member or part of the body politic. It is not necessary that these threats, acts of violence and intimidation were committed and done by the Equity Society, or the Nicholas County Board of Control. It is sufficient if they were done by those interested in the society, or members of the society, for the supposed purpose of furthering its interests. The society may not be held for acts of violence done by individual members thereof in furtherance of what they conceive to be the interests of the society; but, where a contract has been obtained from one by reason of threats of personal violence or the destruction of his property, the society is in no position in good conscience and fair dealing, to ask that such contract be upheld and enforced.

In 14 Cyc., 1123, duress is defined to be:

"A condition which exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will; a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do an act or make a contract not of his own volition; personal restraint or fear or personal injury or

imprisonment; * * * unlawful detention of the property of any such person."

Under the evidence in this case it appears that appellee was advised that if he did not enter the pool he was in danger of being subjected to personal violence or of having his property destroyed.

But it is urged that in Hazelrigg v. Donaldson, 2 Met. 445, this court, in defining duress, held that "the withholding of a man's property illegally does not place him under fear or duress." A very different state of facts was presented there from those under consideration. The sheriff in that case had seized the property of one man as belonging to another. The real owner of the property requested the sheriff to surrender it to him. He declining to do so, the owner signed the forthcoming bond for. the debt in order to have his property released. When proceeded against on the bond he attempted to excuse himself from liability on the ground that it had been procured under duress, but the court held otherwise, and properly so. No such case as that is here presented. There the owner knew who had his property. He had a perfect legal remedy had he chosen to exercise it. He was not placed in fear, and he was in no danger of losing his property, or of having it destroyed, or of being subjected to physical punishment because he was demanding it or asserting his rights to it.

In this case, however, appellee was confronted with a condition with which he could neither cope nor hope to control, and if, under these circumstances, he executed the contract, he was not acting as a free agent, but was constrained to do, by reason of these threats of bodily violence and loss of his property, that which he neither desired to do nor would have done had he been free to act in the matter.

Where one, in dealing with his property rights, is forced by stress of circumstance to part with money or enter into an agreement against his will, courts have with a degree of uniformity held that such contracts are void, and money paid thereunder is recoverable. These decisions, as said in Adams v. Schiffer, 11 Colorado, 15 7 Am. St., 202, "while not uniform in their expressions of the law, all rest upon the proposition that the duress of the property was such as to render the contract or payment involuntary." Continuing, it is said in that opinion:

"It seems to be well settled that where a party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made or money paid by the owner under such circumstances, to emancipate the property, is to be regarded as made under compulsion."

The case of Astley v. Reynolds, 2 Strange, 915, is regarded as the leading English case. There a pawn broker refused to deliver goods pawned, except upon payment of excessive interest. The owner having paid this to obtain possession of his property, he was allowed to recover back the excess.

The Supreme Courts of Maine (in Briggs v. Lewiston, 29 Me., 472), Pennsylvania (in Grim v. School District, 57 Pa. St., 433), and Massachusetts (in Amesbury, &c., Mfg. Co. v. Amesbury, 17 Mass., 461), have held that the exaction of illegal taxes and tolls constitute a class of cases in which a recovery may be had upon the same principle. In Scholey v. Munford, 60 N. Y., 498, it was held that illegal commissions demanded and paid to secure the surrender of bonds were recoverable. And in White v. Heylman, 34 Pa. St., 142, it was held that money paid to secure a transfer of patents wrongfully withheld might be recovered.

A much stronger case is here presented than that in either of the cases from which we have quoted, for here the fear which induced the making of the contract was not alone the loss of property, but of physical punishment as well.

We are of opinion that the instruction presented for the consideration of the jury fairly and fully covers the law of the case, as warranted by the facts proven; that the instruction defining duress, as given by the court, was correct.

This opinion is certified as the law of the case.

Judge Winn not sitting.