STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH TOSCANO, DEFENDANT-APPELLANT.

Argued September 27, 1976—Decided June 27, 1977.

Mr. *S. M. Chris Franzblau* argued the cause for appellant (*Messrs. Franzblau, Cohen and Falkin,* attorneys; *Mr. Franzblau,* of counsel and on the brief; *Mr. Gary L. Falkin,* of counsel).

Mr. *Roy B. Greenman,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Prosecutor, attorney; *Mr. Greenman,* of counsel and on the brief).

Mr. *William P. Welaj,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey. (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Welaj* of counsel and on the brief).

The opinion of the court was delivered by

PASHMAN, J. Defendant Joseph Toscano was convicted of conspiring to obtain money by false pretenses in violation of *N. J. S. A.* 2A:98–1. Although admitting that he had aided in the preparation of a fraudulent insurance claim by making out a false medical report, he argued that he had acted under duress. The trial judge ruled that the threatened

harm was not sufficiently imminent to justify charging the jury on the defense of duress. After the jury returned a verdict of guilty, the defendant was fined $500.

The Appellate Division affirmed the conviction. 153 *N. J. Super.* 7 (App. Div. 1975). It stressed that defendant had ample opportunity between the time of the threat and the commission of the allegedly coerced act to report the matter to the police or to avoid participation in the conspiracy altogether. Relying on *State v. Churchill,* 105 *N. J. L.* 123 (E. & A. 1928) and *State v. Palmieri,* 93 *N. J. L.* 195 (E. & A. 1919), it also concluded that defendant failed to satisfy the threshold condition that the threatened harm be "present, imminent and impending."

We granted certification to consider the status of duress as an affirmative defense to a crime. 68 *N. J.* 487 (1975). We hold that duress is an affirmative defense to a crime other than murder, and that it need not be based upon an alleged threat of immediate bodily injury. Under the standard announced today, we find that this defendant did allege sufficient facts to warrant charging the jury on his claim of duress. Accordingly, we reverse his conviction and remand for a new trial.

I

On April 20, 1972, the Essex County Grand Jury returned a 48-count indictment alleging that eleven named defendants and two unindicted co-conspirators had defrauded various insurance companies by staging accidents in public places and obtaining payments in settlement of fictitious injuries. The First Count of the indictment alleged a single conspiracy involving twelve different "staged" accidents over a span of almost three years. In the remaining counts, the participants were charged with separate offenses of conspiracy, obtaining money by false pretenses and receiving fraudulently obtained money.

Dr. Joseph Toscano, a chiropractor, was named as a defendant in the First Count and in two counts alleging a

conspiracy to defraud the Kemper Insurance Company (Kemper). Prior to trial, seven of the eleven defendants pleaded guilty to various charges, leaving defendant as the sole remaining defendant charged with the conspiracy to defraud Kemper. Among those who pleaded guilty was William Leonardo, the architect of the alleged general conspiracy and the organizer of each of the separate incidents. Although the First Count was dismissed by the trial judge at the conclusion of the State's case,[1] the evidence did reveal a characteristic *modus operandi* by Leonardo and his cohorts which is helpful in understanding the fraudulent scheme against Kemper. Typically, they would stage an accident or feign a fall in a public place.[2] A false medical report for the "injured person, together with a false verification of employment and lost wages, would then be submitted to the insurer of the premises. The same two doctors were used to secure the medical reports in every instance except that involving the claim against Kemper. Likewise, the confirmations of employment and lost wages were secured from the same pool of friendly employers. The insurance companies made cash payments to resolve the claims under their "quick settlement" programs, usually within a few weeks after the purported accidents. Leonardo took responsibility for divid-

---

[1]Defendant moved to sever his trial from those of three other defendants on the ground that he participated in the alleged general conspiracy on only one occasion. He renewed the motion without success after the dismissal of the First Count. In addition to this refusal to sever, defendant raises several other errors supposedly committed by the trial judge, including a prejudicial charge to the jury and failure to grant a motion for acquittal. Because of our holding that the issue of duress was erroneously withheld from the jury, we do not reach those questions.

[2]The mishaps occurred in supermarkets, discount stores, movie theaters and a factory. On two occasions, Leonardo and others deliberately caused an accident while road testing a used car from a dealer. There were three incidents in 1968, five in 1969, three in 1970 and one in 1971.

ing the funds to the "victims" of the accidents, to the doctors and employers, taking a substantial portion for himself.

Michael Hanaway, an unindicted co-conspirator who acted as the victim in a number of these staged accidents, testified that defendant was drawn into this scheme largely by happenstance. On January 6, 1970, Hanaway staged a fall at E. J. Korvette's in Woodbridge, New Jersey under the direction of Leonardo and Frank Neri, another defendant who pleaded guilty prior to trial. Dr. Miele, one of the two doctors repeatedly called upon by Leonardo to provide fraudulent medical reports, attested to Hanaway's claimed injuries on a form supplied by the insurer. Hanaway was subsequently paid $975 in settlement of his claim by the Underwriters Adjusting Company on behalf of Korvette's insurer.

In the meantime, however, the same trio performed a similar charade at the R. K. O. Wellmont Theater in Montclair, New Jersey. Kemper, which insured the R. K. O. Theater, was immediately notified of Hanaway's claim, and Dr. Miele was again enlisted to verify Hanaway's injuries on a medical report. However, because the R. K. O. accident occurred on January 8, 1970 — only two days after the Korvette's incident — Dr. Miele confused the two claims and mistakenly told Kemper's adjuster that he was treating Hanaway for injuries sustained at Korvette's. When Hanaway learned of the claims adjuster's suspicions, he informed William Leonardo who, in turn, contacted his brother Richard (a co-defendant at trial)[3] to determine whether Toscano would agree to verify the treatments.

The State attempted to show that Toscano agreed to fill out the false medical report because he owed money to Richard Leonardo for gambling debts. It also suggested that

---

[3]Richard Leonardo was charged with falsely confirming the employment of various participants in the fraudulent schemes. Since he was only named as a defendant in the general conspiracy count, he was dismissed from the case after the trial judge dismissed the First Count.

Toscano subsequently sought to cover up the crime by fabricating office records of non-existent office visits by Hanaway. Defendant sharply disputed these assertions and maintained that he capitulated to William Leonardo's demands only because he was fearful for his wife's and his own bodily safety. Since it is not our function here to assess these conflicting versions, we shall summarize only those facts which, if believed by the jury, would support defendant's claim of duress.

Defendant first met Richard Leonardo in 1953 as a patient and subsequently knew him as a friend. Defendant briefly encountered the brother, William, in the late 1950's at Caldwell Penitentiary when Toscano served as a prison guard. Although William was an inmate, the doctor did not know him personally. Through conversations with some police officers and William's brother and father, however, he did learn enough about William to know of his criminal record.[4] In particular, Richard told him many times that William was "on junk," that he had a gang, that "they can't keep up with the amount of money that they need for this habit," and that he himself stayed away from William.

Thus, when William first called the defendant at his office, asking for a favor, he immediately cut off the conversation on the pretext that he was with a patient. Although William had not specifically mentioned the medical form at that time, defendant testified that he was "nauseated" by "just his name." A few days later, on a Thursday evening, he received another call in his office. This time Leonardo asked defendant to make out a report for a friend in order to submit a bill to a claims adjuster. He was more insistent, stating that defendant was "going to do it," but de-

---

[4]Defendant attempted to introduce William's criminal record into evidence and to establish his unsavory reputation in the community. Although these efforts were not wholly successful, other testimony at trial supported his characterization of William Leonardo as a violent, erratic individual. Hanaway stated that Leonardo "opened Frank Neri's skull with a bat" and often did "off-the-wall things."

fendant replied that he would not and could not provide the report. Once again the doctor ended the conversation abruptly by claiming, falsely, that he was with other persons.

The third and final call occurred on Friday evening. Leonardo was "boisterous and loud" repeating, "You're going to make this bill out for me." Then he said: "Remember, you just moved into a place that has a very dark entrance and you leave there with your wife. . . . You and your wife are going to jump at shadows when you leave that dark entrance."[5] Leonardo sounded "vicious" and "desperate" and defendant felt that he "just had to do it" to protect himself and his wife. He thought about calling the police, but failed to do so in the hope that "it would go away and wouldn't bother me any more."

In accordance with Leonardo's instructions, defendant left a form in his mailbox on Saturday morning for Leonardo to fill in with the necessary information about the fictitious injuries. It was returned that evening and defendant completed it. On Sunday morning he met Hanaway at a prearranged spot and delivered a medical bill and the completed medical report. He received no compensation for his services, either in the form of cash from William Leonardo or forgiven gambling debts from Richard Leonardo. He heard nothing more from Leonardo after that Sunday.

Shortly thereafter, still frightened by the entire episode, defendant moved to a new address and had his telephone number changed to an unlisted number in an effort to avoid future contacts with Leonardo. He also applied for a gun permit but was unsuccessful. His superior at his daytime job with the Newark Housing Authority confirmed that the quality of defendant's work dropped so markedly that he was forced to question defendant about his attitude. After some conversation, defendant explained that he had been upset by threats against him

---

[5]Defendant described the exit from his office as a "very, very pitch black alleyway" on the side of the building.

and his wife. He also revealed the threats to a co-worker at the Newark Housing Authority.

After defendant testified, the trial judge granted the State's motion to exclude any further testimony in connection with defendant's claim of duress, and announced his decision not to charge the jury on that defense. He based his ruling on two decisions by the former Court of Errors and Appeals, *State v. Palmieri, supra,* and *State v. Churchill, supra,* which referred to the common law rule that a successful claim of duress required a showing of a "present, imminent and impending" threat of harm. As he interpreted these decisions, the defendant could not satisfy this standard by establishing his own subjective estimate of the immediacy of the harm. Rather, the defendant was obliged to prove its immediacy by an objective standard which included a reasonable explanation of why he did not report the threats to the police. Since Toscano's only excuse for failing to make such a report was his doubts that the police would be willing or able to protect him, the court ruled that his subjective fears were irrelevant.

After stating that the defense of duress is applicable only where there is an allegation that an act was committed in response to a threat of present, imminent and impending death or serious bodily harm, the trial judge charged the jury:

Now, one who is standing and receiving instructions from someone at the point of a gun is, of course, in such peril. One can describe such threat as being imminent, present and pending, and a crime committed under those circumstances, or rather conduct engaged in under those circumstances, even though criminal in nature, would be excused by reason of the circumstances in which it was committed.

Now, where the peril is not imminent, present and pending to the extent that the defendant has the opportunity to seek police assistance for himself and his wife as well, the law places upon such a person the duty not to acquiesce in the unlawful demand and any criminal conduct in which he may thereafter engage may not be excused. Now, this principle prevails regardless of the subjective estimate he may have made as to the degree of danger with which he or his wife may have been confronted. Under the facts of this case,

I instruct you, as members of the jury, that the circumstances described by Dr. Toscano leading to his implication in whatever criminal activities in which you may find he participated are not sufficient to constitute the defense of duress.

## II

The trial judge's formulation of the law of duress appears in harmony with recent decisions of this Court. See *State v. Dissicini,* 66 *N. J.* 411 (1975), aff'ing o. b., 126 *N. J. Super.* 565 (App. Div. 1974) ; *State v. Falco,* 60 *N. J.* 570 (1972). Nevertheless, while these cases offer some support for following the common law rule tacitly approved in *Palmieri* and *Churchill,* we question whether those precedents should be controlling under the instant facts.

Here, the sole defect is a failure to allege a "present, imminent and impending" danger of harm as an excuse for defendant's conduct. In none of the recent cases decided by this Court was a claim of duress upheld, and discussion of the defense was sparse. Moreover, in *Dissicini,* two members of this Court noted the unsettled nature of duress in New Jersey and refrained from addressing whether it was even available as a defense to a crime because of the peculiar factual setting presented there. 66 *N. J.* at 411–12 and n. 2 (Pashman, Clifford, JJ., concurring).

Much of this uncertainty stemmed from the decision of the Court of Errors and Appeals in *Palmieri* which intimated that duress might not be available as a defense to a crime under any circumstances. There the defendant claimed that he had participated in a robbery and murder only because he had been threatened by his accomplices. The evidence indicated that he had previously made a trip to the victim's home in an aborted attempt to carry out the robbery, and that he actually shot and killed the victim after the latter had been knocked to the ground by another shot. 93 *N. J. L.* at 196. The Court noted the disagreement in other jurisdictions concerning the status of duress, but pointed out that the alleged threats were made far from

the scene of the crime — "hours, if not days" before the murder was committed. 93 *N. J. L.* at 199–200. Since those jurisdictions which allowed the defense required a showing of "present, imminent and impending" compulsion, the Court declined to address the effect of duress on a crime. *Id.* Although *Palmieri* made no reference to the well-established rule that duress is not a defense to murder, see *infra* at 431, we think that ground also explains its holding.

Nine years later, in *Churchill,* a similar claim of duress was asserted by a defendant who had been convicted of robbery. In that case, the Court observed that the defendant's allegations did not meet the common law test of immediate harm because he had failed to seize on opportunity to escape. However, the Court ruled that it was relieved from deciding the issue because of a procedural waiver, and once again disclaimed any intention of determining whether duress constituted a defense to a crime. 105 *N. J. L.* at 125.

More recently, in *Falco,* a police officer convicted for misconduct in office for filing a false report asserted that he had acted under duress. Chief Justice Weintraub summarily dismissed this claim noting that "[t]he compulsion was to tell the truth; no one ordered defendant to file a false report upon a threat of pain if he did not do so." 60 *N. J.* at 586.

Finally, we affirmed the Appellate Division's opinion in *Dissicini,* holding that duress was not a defense to murder even if the defendant was charged only with aiding and abetting the killing. Although *Dissicini* followed *Palmieri* in refusing to permit duress as a defense to murder, the evidence also indicated that the defendant's fears were not based on a specific threat, but rather resulted from his apprehension that the least sign of disagreement would provoke a violent response from his gang leader. 126 *N. J. Super.* at 569.

Apart from the particular factual patterns in *Dissicini* and *Palmieri,* which made the claims of duress highly implausible,

we think that those cases are *sui generis* because they involved intentional killings. Thus, we approach this case as the first instance in which a defendant charged with a crime other than murder allegedly committed under the threat of serious bodily injury to himself and a near relative has raised the issue of whether such harm must be "present, imminent and impending."

Defendant urges us to abandon the strict view of duress which was impliedly approved in these prior cases. Both the Prosecutor and the Attorney General, appearing as *amicus curiae,* also urge us to define the circumstances under which duress would constitute a defense to a crime. Although they also support a modification of the traditional standard, they argue that even under a more liberal test, the defendant should not be excused for yielding to the alleged threats of future harm and that the trial court's ruling was correct.

### III

Since New Jersey has no applicable statute defining the defense of duress,[6] we are guided only by common law principles which conform to the purposes of our criminal justice system and reflect contemporary notions of justice and fairness. *See State v. Culver,* 23 *N. J.* 495, 503 (1957), *cert. den.,* 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed.* 2d 1441 (1957); *Cf. Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70, 90 (1965); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29, 43–45 (1958).

█ At common law the defense of duress was recognized only when the alleged coercion involved a use or threat of harm which is "present, imminent and pending" and "of such a nature as to induce a well grounded apprehension of

---

[6]The majority of states have no statutory provision defining duress. For a discussion of the statutory sections of the 20 states which have enacted laws on the subject, see *Model Penal Code,* (MPC) § 2.09, Comment 1 at 2–4. (Tent. Draft No. 10, 1960).

death or serious bodily harm if the act is not done." *Nall v. Commonwealth,* 208 *Ky.* 700, 271 *S. W.* 1059 (1925); *Browning v. State,* 31 *Ala. App.* 137, 13 *So.* 2d 54 (1943); *State v. Clay,* 220 *Iowa* 1191, 264 *N. W.* 77, 83 (1935); *State v. Patterson,* 117 *Or.* 153, 241 *P.* 977, 979 (1926). *See generally* 22 *C. J. S.* Criminal Law § 44 at pages 135–36; 21 *Am. Jur.* 2d Criminal Law, § 100 at 180; Perkins, *Criminal Law* (2 ed. 1969) 916–18; Annotation, "Compulsion, Coercion or Duress as Defense to Criminal Prosecution," 40 *A. L. R.* 2d 910 (1955).

It was commonly said that duress does not excuse the killing of an innocent person even if the accused acted in response to immediate threats. *Arp v. State,* 97 *Ala.* 5, 12 *So.* 301 (1893); *Brewer v. State,* 72 *Ark.* 145, 78 *S. W.* 773 (1904); *State v. Nargashian,* 26 *R. I.* 299, 58 *A.* 953 (1904); *People v. Martin,* 13 *Cal. App.* 96, 108 *P.* 1034 (1910); *Taylor v. State,* 158 *Miss.* 505, 130 *So.* 502 (1930).[7] Aside from this exception, however, duress was permitted as a defense to prosecution for a range of serious offenses, *see, e. g., D'Aquino v. United States,* 192 *F.* 2d 338, 358 (9 Cir. 1951) (treason; capital offense); *Gillars v. United States,* 87 *U. S. App. D. C.* 16, 182 *F.* 2d 962, 976 (D. C. Cir. 1950) (treason); *Shannon v. United States,* 76 *F.* 2d 490 (10 Cir. 1935) (kidnapping); *State v. Ellis,* 232 *Or.* 70, 374 *P.* 2d 461 (1962) (kidnapping); *Ross v. State,* 169 *Ind.* 388, 82 *N. E.* 781 (1907) (arson); and many lesser crimes, *see, e. g.,*

---

[7] The broad assertion that duress is unavailable as a defense to homicide appears repeatedly in the cases and treatises, but several commentators have observed that the decisions have involved murder as opposed to manslaughter. In repeating this adage, moreover, courts have typically gone on to stress the opportunities for resistance or escape. *See* Hitchler, "Duress as a Defense in Criminal Cases," 4 *Va. L. Rev.* 519, 528 (1917); Hall, *General Principles of Criminal Law,* 525 (1947). The Model Penal Code draftsmen point out that duress instructions have sometimes been given in murder cases. *Model Penal Code,* § 2.09, Comment 1, at 4 n. 24. (Tent. Draft No. 10, 1960).

*People v. Merhige,* 212 *Mich.* 601, 180 *N. W.* 418 (1920) (robbery); *Nall v. Commonwealth, supra,* (breaking and entering with intent to steal); *People v. Sanders,* 82 *Cal. App.* 778, 256 *P.* 251 (1927) (forgery); *Hall v. State,* 136 *Fla.* 644, 187 *So.* 392 (1939) (perjury).

To excuse a crime, the threatened injury must induce "such a fear as a man of ordinary fortitude and courage might justly yield to." *United States v. Haskell,* 26 *Fed. Cas.* 207 (Pa. Cir. Ct. 1823); *Powe v. State,* 176 *Miss.* 455, 169 *So.* 763 (1936). Although there are scattered suggestions in early cases that only a fear of death meets this test, *see Respublica v. M'Carty,* 2 *U. S.* 86, 2 Dall. 86, 1 *L. Ed.* 300 (Pa. Supr. Ct. 1781) (treason); *United States v. Haskell, supra,* (treason),[8] an apprehension of immediate serious bodily harm has been considered sufficient to excuse capitulation to threats. *Hamilton v. State,* 205 *Ind.* 26, 184 *N. E.* 170 (1933); *Carroll v. State,* 16 *Ala. App.* 454, 78 *So.* 717 (1918); *People v. Sanders,* 82 *Cal. App.* 778, 256 *P.* 251 (1927). Thus, the courts have assumed as a matter of law that neither threats of slight injury nor threats of destruction to property are coercive enough to overcome the will of a person of ordinary courage. *See People v. Ricker,* 45 *Ill.* 2d 562, 262 *N. E.* 2d 456 (1970) (loss of job); *D'Aquino v. United States, supra* (denial of food rations); *Moore v. State,* 23 *Ala. App.* 432, 127 *So.* 796 (1930) (loss of job). *Cf. State v. Gann, N. D.* 244 *N. W.* 2d 746 (1976) (economic need); *United States v. Palmer,* 458 *F.* 2d 663 (9 Cir. 1972) (prospect of "financial ruin"). A "generalized fear of retaliation" by an accomplice, unrelated to any specific threat, is also insufficient. *See*

---

[8]Several states, by statute, continue to require that the actor have reasonable cause to believe that his life was in danger. *See, e. g., Arizona Rev. Stat. Ann.,* Tit. 13–134 (1956); *Arkansas Stat. Ann.* § 41–117 (1947); *Deering's California Penal Code* § 26(8) (1960); *Colorado Rev. Stat. Ann. Ch.* 40–1–11 (1960); *Idaho Code,* §18–101 (1947); *Montana Rev. Code Ann.,* Tit. 94–201 (1947). Minnesota limits the defense to situations in which "instant death" is threatened. *Minn. Stat.* 609.08 (1965).

*People v. Robinson*, 41 *Ill. App.* 3d 526, 354 *N. Ed.* 2d 117 (1976); *Harris v. State*, 91 *Tex. Cr. R.* 446, 241 *S. W.* 175 (1922); *People v. Merhige*, 212 *Mich.* 601, 180 *N. W.* 418 (1920).

More commonly, the defense of duress has not been allowed because of the lack of immediate danger to the threatened person. When the alleged source of coercion is a threat of "future" harm, courts have generally found that the defendant had a duty to escape from the control of the threatening person or to seek assistance from law enforcement authorities. *See, e. g., Shannon v. United States*, 76 *F.* 2d 490, 493 (10 Cir. 1935); *Burton v. State*, 51 *Tex. Cr. R.* 196, 101 *S. W.* 226 (1907); *Burns v. State*, 89 *Ga.* 527, 15 *S. E.* 748 (1892); *Bain v. State*, 67 *Miss.* 557, 7 *So.* 408 (1890).

Assuming a "present, imminent and impending" danger, however, there is no requirement that the threatened person be the accused. Although not explicitly resolved by the early cases,[9] recent decisions have assumed that concern for the well-being of another, particularly a near relative, can support a defense of duress if the other requirements are satisfied. *See United States v. Gordon*, 526 *F.* 2d 406 (9 Cir. 1975) (friends imperiled); *United States v. Stevison*, 471 *F.* 2d 143 (7 Cir. 1972) (suicide threat by defendant's daughter); *Hood v. State*, 313 *N. E.* 2d 546 (Ind. App. 1974); *Koontz v. State*, 204 *So.* 2d 224 (Fla. App. 1967) (threats to mother and sister). *Cf. State v. Gann, supra* (need to support family).

A less rigorous standard has been imposed in a few cases involving relatively minor, non-violent crimes. In *Hall v. State, supra,* for instance, a conviction for perjury was overturned because the trial court failed to charge the jury that

---

[9]See the concurring remarks of Judge Magruder in *R. I. Recreation Center v. Aetna Casualty & Surety Co.*, 177 *F.* 2d 603, 606–07 (1 Cir. 1949), referring to the dearth of authority on this point but adding: ". . . if the question were ever presented under sufficiently strong, dramatic and convincing circumstances, I am fairly sure the courts would sanction the defense of coercion."

the defendant needed only reasonable grounds to believe that danger was imminent. The court did not discuss the possibility that, instead of making false statements, the defendant could have appealed to the trial judge for protection against reprisal. *But see Bain v. State, supra* (duress unavailable as a defense to perjury). And in *Commonwealth v. Reffitt,* 149 *Ky.* 300, 148 *S. W.* 48 (1912) a tenant farmer entered into an illegal transaction after being threatened with physical harm and destruction of his crop. Although there was no clearcut threat of immediate danger, the court emphasized the inability of the civil and military authorities to prevent acts giving rise to the illegal coercion. *Cf. Perryman v. State,* 63 *Ga. App.* 819, 12 *S. E.* 2d 388 (1940) (testimony of alleged accomplices admitted because they were coerced).

For the most part, however, the same test has been utilized to assess the sufficiency of the defendant's allegations for the purpose of charging the jury, regardless of the nature of the crime. *Compare United States v. Birch,* 470 *F.* 2d 808 (4 Cir. 1972) *cert.* den. 411 *U. S.* 931, 93 *S. Ct.* 1897, 36 *L. Ed.* 2d 390 (1972) (falsifying government documents) and *United States v. Palmer, supra* (illegal presence in the United States) *with D'Aquino v. United States, supra* (treason) and *Shannon v. United States, supra* (kidnapping).

■ The insistence under the common law on a danger of immediate force causing death or serious bodily injury may be ascribed to its origins in early cases dealing with treason, *see, e. g., Respublica v. M'Carty, supra; Rex v. McGrowther,* 168 *Eng. Rep.* 8 (1746), to the proclivities of a "tougher-minded age," *R. I. Recreation Center v. Aetna Casualty & Surety Co., supra,* 177 *F.* 2d at 605, or simply to judicial fears of perjury and fabrication of baseless defenses. We do not discount the latter concern as a reason for caution in modifying this accepted rule, but we are concerned by its obvious shortcomings and potential for injustice. Under some circumstances, the commission of a minor criminal offense should be excusable even if the coercive agent does not use

or threaten force which is likely to result in death or "serious" bodily injury.[10] Similarly, it is possible that authorities might not be able to prevent a threat of future harm from eventually being carried out. As shown by *Commonwealth v. Reffitt, supra,* and *Hall v. State, supra,* the courts have not wholly disregarded the predicament of an individual who reasonably believes that appeals for assistance from law enforcement officials will be unavailing, but there has been no widespread acknowledgment of such an exception. *See generally* LeFave & Scott, *Criminal Law* § 49 at 377–78 (1972); Annotation, *supra,* 40 *A. L. R.* 2d at 913. Warnings of future injury or death will be all the more powerful if the prospective victim is another person, such as a spouse or child, whose safety means more to the threatened person than his own well-being. Finally, as the drafters of the Model Penal Code observed, "long and wasting pressure may break down resistance more effectively than a threat of immediate destruction." § 2.09, Comment at 8 (Tent. Draft No. 10, 1960).

Commentators have expressed dissatisfaction with the common law standard of duress. Stephen viewed the defense as a threat to the deterrent function of the criminal law, and argued that "it is at the moment when temptation is strongest that the law should speak most clearly and emphatically to the contrary." Stephen, 2 *History of the Criminal Law in England* 107 (1883). A modern refinement of this position

---

[10]If the only consideration were the maximization of social benefits in a single instance, there would undoubtedly be situations in which even the destruction of property or of a person's reputation would constitute a greater evil than the commission of an act proscribed by the criminal law. See LeFave & Scott, *Criminal Law* § 49 at 378, 379 (1972); Hitchler, *supra,* 4 *Val. L. Rev.* at 535. Both the Model Penal Code and the proposed New Jersey Penal Code establish a general principle of justification as a defense, which would encompass many of those cases. *See Model Penal Code* § 3.02, Comment (Tent. Draft No. 8, 1958); *New Jersey Penal Code* § 2C:3-1 (1971). Under present law, however, such a defense is limited to self-defense or defense of another. *See State v. Abbott,* 36 *N. J.* 63 (1961).

is that the defense should be designed to encourage persons to act against their self-interest if a substantial percentage of persons in such a situation would do so. Hall, *General Principles of Criminal Law* (2 ed. 1960), 446–47. This standard would limit its applicability to relatively minor crimes and exclude virtually all serious crimes unless committed under threat of imminent death. *Id.* at 448.[11]

Others have been more skeptical about the deterrent effects of a strict rule. As the Alabama Supreme Court observed in an early case:

That persons have exposed themselves to imminent peril and death for their fellow man, and that there are instances where innocent persons have submitted to murderous assaults, and suffered death, rather than take life, is well established; but such self-sacrifice emanated from other motives than the fear of legal punishment.

[*Arp v. State, supra,* 97 *Ala.* at 12, 12 *So.* at 303.]

Building on this premise, some commentators have advocated a flexible rule which would allow a jury to consider whether the accused actually lost his capacity to act in accordance with "his own desire, or motivation, or will" under the pressure of real or imagined forces. *See* Newman & Weitzer, "Duress, Free Will and the Criminal Law," 30 *S. Cal. L. Rev.* 313, 331 (1957); Fletcher, "The Individualization of Excusing Conditions," 47 *S. Cal. L. Rev.* 1269, 1288–93 (1974). The inquiry here would focus on the weaknesses and strengths of a particular defendant, and his subjective

---

[11]This approach goes considerably beyond the common law in severity. *See State v. St. Clair,* 262 *S. W.* 2d 25, 27 (Mo. 1953) ("coercion does not excuse taking the life of an innocent person, yet it does excuse in all lesser crimes"); *Nall v. Commonwealth, supra,* 271 *S. W.* at 1060. See generally, Perkins, *supra,* at 916. However, several states have distinguished between capital and non-capital crimes, and felony and non-felony offenses. *See, e. g., Texas Stat. Ann.–Penal Code* § 8.05 (1970). *See generally,* Hersey & Avins, "Compulsion as a Defense to Criminal Prosecution," 11 *Okla. L. Rev.* 283, 287 (1958).

reaction to unlawful demands. Thus, the "standard of heroism" of the common law would give way, not to a "reasonable person" standard, but to a set of expectations based on the defendant's character and situation. *Cf. Chambers v. Florida*, 309 *U. S.* 227, 60 *S. Ct.* 472, 84 *L. Ed.* 716 (1940) (coerced confession); *State v. Taylor*, 46 *N. J.* 316 (1966) (no coercion by physical or psychological pressure; confession voluntary); *Rubenstein v. Rubenstein*, 20 *N. J.* 359 (1956) (contract entered into under duress).

The drafters of the Model Penal Code and the New Jersey Penal Code sought to steer a middle course between these two positions by focusing on whether the standard imposed upon the accused was one with which "normal members of the community will be *able* to comply * * * *" They stated:

* * * law is ineffective in the deepest sense, indeed it is hypocritical, if it imposes on the actor who has the misfortune to confront a dilemmatic choice, a standard that his judges are not prepared to affirm that they should and could comply with if their turn to face the problem should arise. Condemnation in such case is bound to be an ineffective threat; what is, however, more significant is that it is divorced from any moral base and is injust. Where it would be both 'personally and socially debilitating' to accept the actor's cowardice as a defense, it would be equally debilitating to demand that heroism be the standard of legality.

> [*Model Penal Code* § 2.09, Comment at 7 (Tent. Draft No. 10, 1960), quoting Hart, "The Aims of the Criminal Law," 23 *Law & Contemp. Prob.* 401, 414 and n. 31 (1958); *New Jersey Model Penal Code* § 2C:2–9, Commentary at 71 (1971).]

Thus, they proposed that a court limit its consideration to an accused's "situation" to "stark, tangible factors which differentiate the actor from another, like his size or strength or age or health," excluding matters of temperament. They substantially departed from the existing statutory and common law limitations requiring that the result be death or serious bodily harm, that the threat be immediate and aimed at the accused, or that the crime committed be a non-capital offense. While these factors would be given evidential weight, the

failure to satisfy one or more of these conditions would not justify the trial judge's withholding the defense from the jury. *Model Penal Code, supra,* at 7–8; *New Jersey Penal Code, supra,* at 71.

Both the Prosecutor and the Attorney General substantially approve of the modifications suggested by the drafters of the model codes. However, they would allow the issue to be submitted to the jury only where the trial judge has made a threshold determination that the harm threatened was "imminent." Defendant, in a rather cryptic fashion, refers us to New York's statutory definition of duress, *New York Penal Code* § 40.00 (1970), which requires a showing of coercion by the use or threatened imminent use of unlawful force. However, he advocates leaving the question of immediacy to the jury.

For reasons suggested above, *ante* at 435–436, a *per se* rule based on immediate injury may exclude valid claims of duress by persons for whom resistance to threats or resort to official protection was not realistic. While we are hesitant to approve a rule which would reward citizens who fail to make such efforts, we are not persuaded that capitulation to unlawful demands is excusable only when there is a "gun at the head" of the defendant. We believe that the better course is to leave the issue to the jury with appropriate instructions from the judge.

█ Although they are not entirely identical, under both model codes defendant would have had his claim of duress submitted to the jury.[12] Defendant's testimony provided a

---

[12]The most significant difference between the two provisions is the treatment of duress as a defense to murder. The Model Penal Code permits it as an affirmative defense, while the New Jersey Penal Code allows it only to reduce a crime from murder to manslaughter. The relevant portions of the two provisions are set forth below:

*Model Penal Code* § 2.09

(1) It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced

factual basis for a finding that Leonardo threatened him and his wife with physical violence if he refused to assist in the fraudulent scheme. Moreover, a jury might have found from other testimony adduced at trial that Leonardo's threats induced a reasonable fear in the defendant. Since he asserted that he agreed to complete the false documents only because of this apprehension, the requisite elements of the defense were established. Under the model code provisions, it would have been solely for the jury to determine whether a "person of reasonable firmness in his situation" would have failed to seek

to do so by the use of, or a threat to use, unlawful force against his person of another, which a person of reasonable firmness in his situation would have been unable to resist.

(2) The defense provided by 'this Section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

*New Jersey Penal Code* § 2C:2-9

a. Subject to Subsection b of this Section, it is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

b. The defense provided by this Section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was criminally negligent in placing himself in such a situation, whenever criminal negligence suffices to establish culpability for the offense charged. In a prosecution for murder, the defense is only available to reduce the degree of the crime to manslaughter.

The Prosecutor and the Attorney General argue that we should follow neither provision, but rather rule that duress can never be a defense to a crime involving a homicide or an intent to kill. See *Watson v. State*, 212 *Miss.* 788, 55 *So.* 2d 441 (1951). In the circumstances of this case, we deem it inappropriate to extend or modify our holdings in *Dissicini* and *Palmieri*. Insofar as those cases adhere to the common law rule that duress is not a defense to murder, see *ante* at 431, we reaffirm them today. As indicated in Part I, *ante* at 429, we find this case to be clearly distinguishable from *Dissicini* and *Palmieri*.

police assistance or refused to cooperate, or whether such a person would have been, unlike defendant, able to resist.

■ Exercising our authority to revise the common law, cf. *Faber v. Creswick*, 31 *N. J.* 234, 241 (1959), we have decided to adopt this approach as the law of New Jersey. Henceforth, duress shall be a defense to a crime other than murder if the defendant engaged in conduct because he was coerced to do so by the use of, or threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

■ ■ We have deliberately followed the language of the proposed *New Jersey Penal Code* in stating our holding and we expect trial judges to frame their jury charges in the same terms. The defendant shall have the burden of producing sufficient evidence to satisfy the trial judge that the fact of duress is in issue. Such evidence may appear in the State's case or that of the defendant. *See State v. Fair*, 45 *N. J.* 77, 91 (1965) ; *State v. Abbott*, 36 *N. J.* 63, 72 (1961) ; *State v. Chiarello*, 69 *N. J. Super.* 479, 498 (App. Div. 1961) ; McCormick, *Evidence*, § 341 at 801–802 (1972) ; Wigmore, *Evidence* (3 ed. 1940), § 2485 at 271. No longer will there be a preliminary judicial determination that the threats posed a danger of "present, imminent and impending" harm to the defendant or to another. In charging the jury, however, the trial judge should advert to this factor of immediacy, as well as the gravity of the harm threatened, the seriousness of the crime committed, the identity of the person endangered, the possibilities for escape or resistance and the opportunities for seeking official assistance. He should also emphasize that the applicable standard for judging the defendant's excuse is the "person of reasonable firmness in [the accused's] situation."

■ ■ Finally, the trial judge will instruct the jury that the defendant has the burden of persuasion on the issue of duress and that he must establish the defense by a preponderance of the evidence in order to win an acquittal. To

avoid confusion, the judge should stress that the prosecution must prove all other elements of the crime and disprove any other defenses beyond a reasonable doubt. Only if the prosecution has met that burden should the jury consider the affirmative defense of duress; at that point alone will the defendant have the burden of proving the defense by a preponderance of the evidence in order to prevail.

We recognize that in other instances where the initial burden of producing evidence in support of an affirmative defense has been placed on the defendant, the burden of disproving the defense beyond a reasonable doubt has remained with the State. *See, e. g., State v. Stein,* 70 *N. J.* 369, 393 (1976) (entrapment) ; *State v. Dolce,* 41 *N. J.* 422, 432 (1964) (entrapment) ; *State v. Abbott, supra,* 36 *N. J.* at 71–72 (self-defense). In this case, however, we think it more appropriate as a matter of public policy to follow the practice utilized in insanity cases and to require the defendant to prove the existence of duress by a preponderance of the evidence. *See State v. Lewis,* 67 *N. J.* 47, 48 (1975) ; *State v. DiPaglia,* 64 *N. J.* 288, 293 (1974) ; *State v. Cordasco,* 2 *N. J.* 189, 196 (1949).

The peculiar nature of duress, which focuses on the reasonableness of the accused's fear and his actual ability to resist unlawful demands, is not completely offset by the "person of reasonable firmness" standard. While the idiosyncracies of an individual's temperament cannot excuse an inability to withstand such demands, his attributes (age, health, etc.) are part of the "situation" which the jury is admonished to consider. We think that the admittedly openended nature of this standard, with the possibility for abuse and uneven treatment, justifies placing the onus on the defendant to convince the jury. *See* Note, "Justification: The Impact of the Model Penal Code on Statutory Reform," 75 *Colum. L. Rev.* 914, 917 and n. 9 (1975) ; *cf. Morrison v. California,* 291 *U. S.* 82, 88–89, 54 *S. Ct.* 281, 284, 78 *L. Ed.* 664, 669 (1933) *; Model Penal Code* § 1.13, Comment at 112 (Tent. Draft No. 4, 1956) ; *New Jersey Penal Code*

§ 2C–1–12, Comment at 36. In this respect, we adhere to the more traditional approach. *See, e. g., State v. Sapienza,* 84 *Ohio St.* 63, 95 *N. E.* 381 (1911); *Hitcher, supra,* 4 *Va. L. Rev.* at 554; *People v. Graham,* 45 *Cal. App.* 3d 616, 119 *Cal. Rptr.* 614 (1975); *New York Penal Law* § 25.0 (McKinney 1975). *But see McCormick, Evidence,* § 341, at 800–02 (1972).

## IV

Defendant's conviction of conspiracy to obtain money by false pretenses is hereby reversed and remanded for a new trial.

CONFORD, P. J. A. D., Temporarily assigned, concurring in part and dissenting in part. I agree with the Court's reversal of the conviction for the reasons stated in its opinion. However, I dissent from the announcement in the opinion that hereafter, and presumably at the retrial herein, defendants in criminal cases asserting duress as a defense will be required to prove the defense to the satisfaction of the fact-finder by a preponderance of the evidence. I regard this change in New Jersey law with respect to the ultimate burden of persuasion as to affirmative defenses (except for the defense of insanity) to be an unwarranted modification of the civilized concept of Anglo-American criminal law that it is the burden of the State to prove the guilt of the criminally accused beyond a reasonable doubt in every case.

The cases cited by the Court (442, second paragraph) amply document the New Jersey and general rule that, as to affirmative defenses (duress clearly being one), defendant has the initial burden of coming forward with some evidence thereof, unless such evidence appears in the State's case, whereupon the ultimate burden of disproving the defense beyond a reasonable doubt is required to be borne by the State. This rule is adhered to by both the A. L. I. Model Penal Code and the proposed New Jersey Penal

Code. See M. P. C. (proposed official draft 1962) Sec. 1.12
(1), (2); Commentary, Tent. Dr. No. 4 (1955) pp. 108–
113; N. J. P. C. (1971) Sec. 2C:1–12 a. b. (1); Com-
mentary, pp. 35–36. In commenting upon the operation of
the rule the Model Penal Code reporter expressly cites with
approval Professor McCormick's listing of duress as a typi-
cal affirmative defense as to which the jury should not be
permitted to convict if they entertain a reasonable doubt.
Commentary, Tent. Dr. No. 4, *supra,* at 112–113; and see
*McCormick, Evidence, Sec.* 321 at 684 (1954); *id.,* second
edition, Sec. 341 at 800–802 (1972).

The Court now reverses the burden of proof as to duress
because of the "open-ended" nature of the defense as newly
reformulated by the Court (whether "a person of reason-
able firmness in [defendant's] situation would have been
unable to resist" the coercion, p. 442) as well as "the pos-
sibility for abuse and uneven treatment" (*supra,* p.
443). The substantive reformulation of the defense of
duress by the Court's opinion is a progressive step in our
jurisprudence. The Court adopts the highly rational view-
point of the Model Penal Code and the proposed New Jer-
sey Penal Code (*supra,* p. 442). However, I do not
regard the defense as thus reformulated as any more sub-
ject to "abuse" and "uneven treatment" than any of the
other criminal affirmative defenses such as self-defense, en-
trapment or the like. If the defense of duress is true in a
particular case the defendant is innocent as having been
free from culpable intent. See *State v. Savoie,* 67 *N. J.*
439, 455 (1975). Ordinarily a defendant cannot be con-
victed unless the jury finds his criminal intent beyond a
reasonable doubt. Yet the rule today adopted by the Court
would permit the jury to convict even if they entertained a
reasonable doubt that the defendant (as a person of reason-
able firmness) had been free from the coercive effect of
duress when he committed the indicted act.

The fact that evidence of duress is peculiarly within the
knowledge of the defendant is no justification for the Court's

position. That situation is more or less true of all affirmative defenses — a circumstance which explains why the standard rule imposes on the defendant the initial burden of coming forward with some evidence of the defense (unless the State's case supplies it). There is no reason to believe a jury less capable, in duress cases as compared with other affirmative defenses, of appraising credibility of witnesses and weighing proofs and accordingly concluding they have no reasonable doubt that the defense is untrue in a particular case.

For these reasons I would not alter the existing rule of burden of proof as to the affirmative defense of duress.

CONFORD, P. J. A. D., concurring in the result

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.